STATE of Missouri, Respondent,

v.

Benedict Louis KEMPER, Appellant.

No. KCD 27015.

Missouri Court of Appeals,
Kansas City District.

Dec. 31, 1975.

Motion for Rehearing and/or Transfer
Denied Feb. 9, 1976.

Applications to Transfer Denied
May 5, 1976.

Frank H. Strong, Larry L. Zahnd, Maryville, William D. Lay, Platte City, Richard J. Habiger, National Juvenile Law Center, St. Louis, for appellant.

John C. Danforth, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

On a change of venue from Nodaway County, a jury in the Platte County Circuit Court found Benedict Kemper guilty on four counts of murder in the first degree. He was sentenced to life imprisonment on each conviction. He appeals from such sentence and judgment.

On October 11, 1972, the bodies of Marion Merrigan and Kathleen Merrigan, husband and wife, and of their children, William and Helen Merrigan, were found in their home near Conception, Missouri. All had died of gunshot wounds from a .22 caliber rifle. The attention of law enforcement officers focused on Benedict Kemper. Shortly after 1:00 A.M., a member of the State Highway Patrol, the Nodaway County Sheriff and the Nodaway County Juvenile Officer went to Kemper's residence, located about ¼ mile from the Merrigan house. After approximately 30 minutes of questioning, Kemper admitted that he had gone to the Merrigan home at around 11:00 P.M., October 10, 1972, and waited in the brush until the light went out. Then he entered the house, went to a first floor bedroom where he shot Mr. and Mrs. Merrigan with a .22 caliber rifle, and then ran up a stairway and shot Billy Merrigan and Helen Merrigan.

On this appeal, the assignments of error fall into three categories: 1. Juvenile court proceedings. 2. Rulings on motions to suppress statements of appellant. 3. Trial errors.

I

Juvenile Court Proceedings

Benedict Kemper was 15 years and 4 months of age on October 10, 1972. Follow-

ing his admissions he was taken into custody and on October 12, 1972, the juvenile officer filed a petition in his interest in the Juvenile Division of the Nodaway County Circuit Court. An order for dismissal of the petition by the court was set aside by this court in a prohibition proceeding. On March 29, 1973, an amended petition was filed in the Juvenile Division. A hearing was held on the amended petition on May 9, 1973. At the conclusion of the hearing the Judge of the Juvenile Division entered findings and an order dismissing the petition filed in appellant's interest and permitting his prosecution under the general law. Thereafter an information was filed charging him with four counts of murder in the first degree and the case eventually proceeded to trial, with the above-mentioned result.

## A

### Constitutionality of § 211.071, RSMo 1969

In the court below and on this appeal, appellant asserts that § 211.071, RSMo 1969, the statute authorizing the juvenile division of the circuit court to dismiss a petition in that court and permit a minor to be prosecuted criminally as an adult, is unconstitutional. The basis of this contention need not be stated, inasmuch as appellant acknowledges that the Supreme Court of Missouri in *State v. Williams*, 473 S.W.2d 382 (Mo.1971), and *Coney v. State*, 491 S.W.2d 501 (Mo.1973), rejected the attack he would make upon this statute. Appellant asserts that these decisions are not in harmony with the Constitution of the United States, but he states that such assertion is made for the purpose of "preserving the issues." He obviously recognizes that this court is obliged to follow the rulings of the Missouri Supreme Court.

## B

### Validity of Order of Juvenile Division

Appellant contends that the order of the Juvenile Division dismissing the petition is void for four reasons. As to each he asserts that the deficiency or error deprived him of fundamental fairness and due process of law under the Federal and State Constitutions. He also asserts that the first two deficiencies produced a denial of effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States. He also assigns, in each instance, violation of the applicable provision of the Juvenile Code.

## 1

### Adequacy of Amended Petition

■ Appellant contends that the amended petition did not give adequate notice of either the purpose of the hearing or of the ultimate facts supporting the legal conclusion that appellant was not a proper subject to be dealt with under the juvenile law.

The amended petition in this case is something of an amalgamation of the basic juvenile court petition under § 211.091, RSMo 1969, coupled with a request that such petition be dismissed on the grounds that Benedict L. Kemper was over the age of 14 years and had allegedly committed an offense which would be a felony if committed by an adult and he is not a proper subject to be dealt with under the juvenile law. The asserted inconsistencies which a petition in such form presented are not such as to deprive the amended petition of its effectiveness in advising appellant of the purpose of the May 9th hearing.

■ With respect to the adequacy of the petition, it did state the offense alleged to have been committed by appellant and the conclusion that he was not a fit subject to be dealt with under the juvenile code. The petition was accompanied by a report of the juvenile officer detailing his reasons for such conclusion. The opinion of this court in *State ex rel. T. J. H. v. Bills*, 495 S.W.2d 722 (Mo.App.1973), affirmed on other grounds, 504 S.W.2d 76 (Mo. banc 1974), is re-adopted as determinative of this contention. 495 S.W.2d 729[18, 19].

■ Appellant contends that, in *State ex rel. R. L. W. v. Billings,* 451 S.W.2d 125 (Mo. banc 1970), the court held that juvenile court proceedings should be treated as equitable actions for procedural purposes, that " 'equitable' proceedings are made to come under the governance of the Rule (sic) of Civil Procedure." 451 S.W.2d 127. Billings involved the application of Rule 51.03 (now Rule 51.05), change of judge, to juvenile court proceedings. The opinion holds that rules of civil procedure may be applicable to juvenile proceedings, absent express provision in the juvenile code. Section 211.071 sets out the contents of a pleading in the juvenile court which will authorize the waiver of jurisdiction by the juvenile court. Compliance with that provision is all that is required and the rules of civil procedure do not enter into the determination of the sufficiency of the pleading.

Appellant contends that the T. J. H. holding of this court on the adequacy of the notice should not be applied because of the inconsistencies in the allegations of the petition and also because, as more fully discussed below, a special juvenile officer testified without having reduced his report to writing.

As for the first contention, the expressed conclusions and recommendations of the juvenile officer in his written report made it clear that his conclusions were directed at obtaining an order relinquishing jurisdiction by the juvenile court. Again, the alleged inconsistent allegations of the petition did not obscure the recommendation of the juvenile officer and his reasons therefor, so that any claim of lack of adequate notice of facts relied upon is without merit.

■ As for the testimony of the special juvenile officer, appellant points to no new basic grounds for dismissal of the petition which were supplied by the testimony of the special juvenile officer. In such circumstances the lack of a written report by such officer would not negate the effectiveness of the notice provided by the petition and the report of the juvenile officer which had been reduced to writing.

2

Testimony of Special Juvenile Officer

Mr. Donald Tharp, an attorney who had previously served as juvenile officer for the Platte County Circuit Court, was appointed to assist the Fourth Circuit Juvenile Officer in this case. When Mr. Tharp was called as a witness in the Juvenile Court proceedings he stated that he had made no written report of his investigation. Counsel for appellant objected to his testifying without having made a prior written report of his investigation. The objection was overruled and Mr. Tharp was permitted to testify. Relying on a statement in *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), appellant now contends that the trial court's ruling was a violation of the constitutional guaranties of fundamental fairness, due process of law and effective assistance of counsel.

In *Kent,* the court stated (383 U.S. 556, 86 S.Ct. 1055):

"It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile."

The court further stated (383 U.S. 557, 86 S.Ct. 1055):

" * * * [W]e conclude that, as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel."

■ This language cannot be taken to mean that any official of the juvenile court who is to testify in waiver proceedings must have, as a constitutional requirement, previously submitted to the court a written report of his investigation. All that it requires is that if the official has submitted such a report which is to be considered by the court, such written report must be

made available to counsel for the juvenile. §§ 211.071 and 211.401, RSMo 1969, relied upon by appellant, do not establish any constitutional barrier to the testimony offered in this case. § 211.401 does require the juvenile officer to keep a written report of his investigation and § 211.071 authorizes the use of such report in waiver proceedings. There is no complaint insofar as compliance by the juvenile officer with these provisions is concerned. *Kent* may impose some constitutional obligation to make such report available to counsel for the juvenile, but no reason appears for broadening that holding to require a written report from other personnel as a condition precedent to their revealing to the court and the juvenile and his counsel simultaneously in the waiver hearing the results of their investigation. Nor should such a meaning be accorded § 211.401, which refers only to the report of the juvenile officer.

### 3

#### Adequacy of Report of Juvenile Officer

■ Again, relying on *Kent v. United States,* supra, appellant asserts that the report of the juvenile officer in this case was not a report of "full social investigation," which he again asserts *Kent* requires as a constitutional matter. The short answer to that contention is that *Kent* referred to the requirement of a "full investigation" as a "statutory requirement" and, in fact, made such reference in the same sentence in which it referred to "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness," clear evidence that the court distinguished the statutory requirement from constitutional requirements.

Insofar as the requirement of the statute is concerned, § 211.401 requires only "a written report." The adequacy of the report is to be determined by the juvenile court, and on appeal is to be looked to as a matter to be considered in the over-all determination of the validity of the juvenile court's determination.

### 4

#### Trial Court's Findings Upon Relinquishment of Juvenile Jurisdiction

The juvenile court's order included the following findings:

"That said child is not a proper subject to be dealt with under the provisions of said Sections 211.011 to 211.431 for the reasons that:

"1. Benedict L. Kemper is now a youth of fifteen years, eleven months.

"2. The alleged charges in the Juvenile Officer's petition would be felonies if committed by an adult; that said offenses are alleged to have been committed against four persons, which resulted in their deaths; and if found to be true would indicate an aggressive, violent, premeditated and wilful manner of conduct.

"3. That said child is not now suffering from mental disease or defect, and was not suffering from any mental disease or defect at the time the alleged crimes were committed; that he has the capacity to understand the proceedings against him and can assist his attorneys in the defense of said causes.

"4. That said child is a well-developed, experienced and mature appearing person.

"5. That said child is of above average intelligence.

"6. That no facilities exist within the Juvenile Court to offer reasonable expectations of treatment and rehabilitation and to afford the community as a whole protection from the acts of said minor child.

"7. That in the totality of the circumstances of said child's case that he should be dealt with under the general law rather than within the benign, rehabilitative purposes of the juvenile code for a period limited to five years, and one month, when he becomes 21 years of age. The Juvenile Code limits retention of jurisdiction of a child by the Juvenile Court to his attainment of the age of twenty-one years."

Appellant asserts that, in reaching its ultimate conclusion that appellant was not a proper subject to be dealt with under the Juvenile Code, the juvenile court failed to

consider and make findings of fact on matters relevant, material and required to support the order, that the order and findings of fact upon which it was based were, in part, devoid of evidentiary support, in part based upon matters and facts which were irrelevant, immaterial, without probative force and inherently prejudicial to appellant, and finally that the findings are not supported by clear, cogent and convincing evidence, or even a preponderance of the evidence.

█ The initial question this assignment presents relates to the nature and scope of review on this appeal. Appellant asserts that review is as in an equity case, citing § 211.171 6.: "The practice and procedure customary in proceedings in equity shall govern all proceedings in the juvenile court." Applying this standard, appellant would require proof in support of the waiver of jurisdiction by "clear, cogent and convincing" evidence. See *Fisher v. Miceli*, 291 S.W.2d 845, 848 (Mo.1956). However, § 211.071 entrusts the determination of whether or not to relinquish jurisdiction to the discretion of the juvenile court judge. It is now well-settled that this is not an uncontrollable discretion and that its exercise must be accompanied by a statement of reasons for relinquishment of juvenile court jurisdiction, arrived at upon a record which admits of meaningful review. *Kent v. United States*, supra. However, the standard of review is whether or not in reaching its conclusion the juvenile court, in view of the totality of the relevant circumstances, abused its discretion. *State v. Thompson*, 502 S.W.2d 359, 363–364[5] (Mo.1973); *State ex rel. T. J. H. v. Bills*, supra, 504 S.W.2d 83, concurring opinion of Donnelly, C. J.

Both appellant and respondent recognize that the opinion of Judge Shangler in the case of *State ex rel. T. J. H. v. Bills*, 495 S.W.2d 722 (Mo.App.1973), contains a fair summary of the considerations proper to be looked at by the juvenile court in arriving at its determination of whether or not to waive jurisdiction, as follows (495 S.W.2d 726–728):

" * * * In *State v. Williams*, 473 S.W.2d 382 (Mo.1971), the court noted first that the juvenile law is integral and each section must be construed in terms of the others. The court then determined that the provisions of the juvenile law, including § 211.071 which describes the waiver procedure and § 211.011 which declares the purpose of the juvenile law, are expressed in terms of common understanding, and that when construed together an explicit statutory standard for waiver appears: A child may be determined by the juvenile court judge not a proper subject to be dealt with under the juvenile law if, after receiving an investigation report and hearing evidence, it reasonably appears that the continued exercise of such jurisdiction will not 'facilitate (the child's) care, protection and discipline . . . and . . . (provide him) such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the state.' § 211.011. Then in *Coney v. State*, 491 S.W.2d 501 (Mo.1973), the Supreme Court determined the same rationale for §§ 211.071 and 211.011, without reference to *Williams*, and also rejected the constitutional argument relator raises here. An earlier decision of the Supreme Court had articulated, more tersely, an equivalent standard for waiver under § 211.071: 'The ultimate purpose of the transfer of a juvenile . . . is to protect the *public* in those cases where rehabilitation appears impossible.' *State ex rel. Arbeiter v. Reagan*, 427 S.W.2d 371, 377[4] (Mo. banc 1968).

\* \* \* \* \* \*

"The decisions of the Missouri Supreme Court which expound the explicit statutory standard for waiver also recognize other clear and intelligible principles implied from that standard by which litigants and juvenile courts may be guided in determining when a juvenile is no longer a proper subject to be dealt with under the juvenile act. A juvenile court might reasonably exercise its discretion to relinquish jurisdiction over a child when, from the totality of circumstances, it appears: 1) the child's 'age, maturity, experience and development' are such as to require prosecution

under the general law (*Coney v. State, supra*), 2) the nature and seriousness of the child's conduct constitutes a threat to the community (*State ex rel. Arbeiter v. Reagan, supra*, 427 S.W.2d l.c. 377[4]; *Coney v. State, supra*), 3) the conduct was committed in a violent and vicious manner (*Coney v. State, supra*); 4) there is reasonable likelihood that like future conduct will not be deterred by continuing the child under the 'care, protection and discipline' of the juvenile law process (*State v. Williams, supra*, 473 S.W.2d l.c. 384). We understand these decisions to mean that any factor which tends to predict the suitability or unsuitability of the juvenile law process for rehabilitation of the child is relevant to the determination of whether he is a proper subject to be dealt with under that law."

■■ Appellant suggests that additional criteria are to be derived from the opinion of the Supreme Court in *State ex rel. T. J. H. v. Bills*, supra, where the court noted that " * * * the fact a charge is serious does not mean it cannot or should not be handled in juvenile court." 504 S.W.2d 81. That statement means no more than that the seriousness of the offense is not to be the sole basis of the court's action. It does not require that that factor be ignored in the total picture, however. Appellant also points to *State v. Thompson*, 502 S.W.2d 359 (Mo.1973), where a conclusion of the juvenile court in waiving jurisdiction, to the effect that the infant there involved had received the benefit of every possible means and resource available under the Juvenile Code and had "demonstrated by his behavior that he cannot adjust to society and that he is beyond further rehabilitative care, treatment and services of this (the juvenile) court; * * *" was found adequate and supported by the record. 502 S.W.2d 364. The prior experience of the juvenile court with the child would necessarily be a "factor which tends to predict the suitability or unsuitability of the juvenile law process for rehabilitation of the child * * *." (*State ex rel. T. J. H. v. Bills* (Mo.App.), supra). However, *Thompson* does not require such prior experience as an essential of waiver.

Turning to the court's findings, the first is that the appellant was then "a youth of fifteen years, eleven months." Appellant questions the relevancy of a finding of age at the time of the decision, stating that age at the time of the offense is the only relevant factor, citing *State v. Brown*, 443 S.W.2d 805 (Mo.1969). Regardless of the reason for the delay between the time of the offense and the date of the court's ruling, the court had to determine what should be the disposition of the petition as of the date of the ruling. Certainly, the age of the youth was significant as it bore on the important question, more fully considered below, of the time available for rehabilitation under the Juvenile Code.

As for the second finding regarding the seriousness of the offense, appellant's attack is premised basically upon reliance on that finding as the exclusive basis of the court's order. Of course, that was not the only finding. It is, however, clearly recognized as a factor to be considered by the juvenile judge. *State ex rel. T. J. H. v. Bills*, supra. Unquestionably, the finding had evidentiary support and it is not to be ignored as reflecting a consideration of the guilt or innocence of the appellant.

■ On the third finding, regarding appellant's mental condition, appellant contends that the finding is not supported by clear, cogent and convincing evidence, and that even if it were, the standard implied in the finding is improper and that the proper standard should be whether the child is "epileptic, mentally deficient or otherwise mentally disordered," the language of § 211.201.

Considering the latter argument first, § 211.201 does authorize the juvenile court, upon finding that a child under its jurisdiction is "epileptic, mentally deficient or otherwise mentally disordered" to commit the child to the division of mental diseases. This provision does not preclude, upon a relinquishment petition, consideration of the child's mental responsibility under the standards of the criminal law. One of appellant's counsel on this appeal has recog-

nized the relevance of such consideration. In proposing a statute expressly stating the findings which must be made as a prerequisite to the waiver of juvenile court jurisdiction, he included the following:

"(b) The child or minor is not suffering from a mental disease or defect for which he should be committed to a state mental hospital which mental disease or defect prevented him from knowing or appreciating the nature, quality or wrongfulness of his conduct or rendered him incapable of conforming his conduct to the requirements of the law; and * * *." Habiger "Prosecution of Children in Missouri Poses Constitutional Problems," 30 Mo.Bar J. 11, 22 (1974).

The trial court is not to be held to have erred in considering appellant's mental condition in the light of criminal law standards in this case.

As for the sufficiency of the evidence to support the court's finding, much of the evidence on the hearing was directed at appellant's mental condition. In his report, the juvenile officer stated that in an interview of the principal of the school which Kemper attended, conducted in early October, 1972 before the offenses here involved, the principal described Kemper as "a walking time bomb," with an uncontrollable temper even though he was very polite. He concluded that Kemper had an "emotional problem," that he was a "loner" who "appeared polite outwardly but was under extreme emotional strain by reason of inability to control his temper." The special juvenile officer testified that in his opinion Kemper was not "normal" and that evaluation and possibly treatment were indicated. The high school principal testified that Kemper was the subject of unjustified charges and ridicule by fellow students and that he was a "loner" and a "walking time bomb" who could not release built-up tension and psychological pressure. Appellant's mother testified that in 1967 or 1968, appellant had gotten into a physical encounter with another boy at the grade school he attended and that she was advised that her son had a problem and should see a psychia-

trist.. He did see psychiatrists in early 1968, but his family could not afford to continue psychiatric treatment.

■ Dr. Elmer Jackson, M.D., Director of the Warren E. Hearnes Youth Center, Fulton State Hospital, testified that he and other medical personnel had examined appellant over a two-month period from late October through December, 1972. He testified that testing and evaluation indicated that appellant was suffering from "an adjustment reaction of adolescence characterized by schizoid and explosive tendencies." He stated that the condition was characterized by "maladjustment, failure to get along" with others, possessing some of the characteristics of schizophrenia. Doctor Jackson testified that he had concluded that appellant had no known disease or defect within the meaning of § 552.010; that he had the capacity to understand the proceedings against him and to assist in his own defense; and that he "did know and appreciate the nature, quality and wrongfulness of his alleged conduct, and was capable of conforming his conduct to the requirements of the law."

Dr. M. R. Gaitonde, M.D., a board certified psychiatrist, examined appellant pursuant to court order on three occasions. He concluded that appellant's mental condition was "personality disorder, explosive personality," of more than five years' duration. He was of the opinion that the condition precluded appellant from conforming his conduct to the requirements of the law at the time of the alleged offense.

On such a record, the finding of the trial court cannot be said to have been unsupported by evidence. The testimony and findings of Doctor Jackson support directly the court's finding. Doctor Gaitonde disagreed with Doctor Jackson's conclusion, but this did not preclude the conclusion reached by the court.

■ As for the fourth and fifth findings, relating to the child's development, experience, maturity and intelligence, *Coney v. State*, 491 S.W.2d 501, 512[14] (Mo. 1973), recognizes that the first three consid-

erations are relevant in a waiver proceeding. They are proper matters for consideration in determining whether or not the criminal law processes are more appropriate than juvenile court procedures. The intelligence of the youth is also a proper factor for consideration. Appellant complains that this finding is not supported by evidence. Kemper's high school principal testified that the youth scored above average on a group intelligence test. Other testimony indicated that the youth had a great deal of ability but that he failed to apply himself. The trial court's finding does not lack evidentiary support.

On the sixth finding relating to the availability of facilities within the juvenile system to offer reasonable expectation of treatment and rehabilitation while affording society protection against acts of appellant, the attack is based upon the lack of evidentiary support for the finding. Appellant contends that the evidence points to a conclusion directly opposite from the court's finding.

The juvenile officer testified that his opinion that Kemper should be dealt with under the criminal law was based in part upon the lack of facilities within the Fourth Judicial Circuit for the rehabilitation or the protection of Kemper "not only for himself, but for the State." He acknowledged that he had arranged for children under the juvenile court's jurisdiction to obtain care and treatment for mental problems. In fact, he had interviewed Kemper on the afternoon of October 11, after the death of the Merrigans, but before the discovery of their bodies. His inquiry at that time related to burglaries in July which Kemper admitted having committed. He had concluded at that time that Kemper should receive psychiatric assistance through the juvenile court, but in view of the seriousness of the later discovered matters, he concluded that Kemper should be dealt with under the criminal law. Mr. Chamberlain stated that he was not familiar with facilities which might be provided at Fulton State Hospital for care of juveniles.

Mr. Tharp, the special juvenile officer, stated that his opinion regarding the disposition of the waiver motion was based in part upon the absence of facilities available to the juvenile court other than "open facilities," from which the individual could leave at will. On cross-examination, Tharp stated that he was familiar with the Biggs Building facility at the Fulton State Hospital, a "quite secure" facility. He acknowledged that juveniles are treated there, although the facility is not exclusively for juveniles, and that the Division of Mental Diseases, upon the commitment of a child to its custody, would determine whether the child should go to the Biggs facility.

Doctor Jackson testified that psychiatric treatment for teenagers was available at the Warren E. Hearnes Youth Center and at four other youth centers. These are open facilities, but teenagers are treated in the Biggs Building, a maximum security facility. Doctor Jackson testified that, if a juvenile court did commit a juvenile to the maximum security facility at Fulton, the Director of the Division of Mental Diseases would transfer him to a less secure facility only after evaluation, but the Director had the power to make such transfers as he saw fit.

██ This evidence did show that there was no exclusively juvenile facility available to the court which would provide the treatment which might be required by the child and still afford the security which the court deemed essential in the handling of a youth such as appellant. There was, as appellant argues, evidence that if appellant were committed to the Division of Mental Diseases the Director might assign him to the Biggs facility. However, there was no assurance that such action might be taken, although Doctor Jackson did state that, if a juvenile court should specify a commitment to the Biggs Building, the assignment would be recognized to the extent of conducting an evaluation in that facility, but no further assurance was provided.

Here the court was considering the disposition of the case of a juvenile who had been evaluated at the Hearnes facility, lo-

cated as is the Biggs facility, at the Fulton State Hospital. Certainly the juvenile court was entitled to consider the conclusion previously reached by members of the staff of the Fulton institution in considering the disposition of the case.

In these circumstances, the contention that the finding of the court is without evidentiary support is unacceptable.

 Appellant also attacks the final finding of the court, particularly as it relates to the sufficiency of the time available within the juvenile framework for appellant's possible rehabilitation. Both Mr. Chamberlain, the juvenile officer, and Mr. Tharp, the special juvenile officer, were of the opinion that facilities were not available within the juvenile framework which might offer rehabilitative possibility within the five and one-half years during which the juvenile court could retain jurisdiction over the youth, or until he became 21 years of age. Both acknowledged that medically trained persons would be in a better position than they to make such an evaluation. However, the testimony of Doctor Gaitonde supports the opinion of these lay witnesses. Doctor Gaitonde in his testimony stressed the possibility of providing treatment for appellant, but made it clear that such a program would be a long-term matter. He stated, in response to a question as to whether or not psychiatric care and treatment would ultimately permit appellant to move again in society:

"Well, counselor, you realize to be a prophet is the saddest thing that a physician should engage in, prophesying, but I would say that the offense that Ben has committed was of such enormity that we should not look lightly. I think that we have a right, as society, to protect, in spite of our compassion, in spite of our feelings or concern for this young man, we have a right to protect ourselves from his irrational outrage as it occurred at that time when he killed four people.

 * * * * * *

" * * * As I said I think that society has to protect itself from any irrational outbursts and therefore I would think of Ben's inpatient hospitalization in terms of years in which he would have to document his behavior, that he is able to conform his conduct on a sustained basis. And the people that are working with him have to be satisfied that yes, we are not letting loose in society a person who could be a menace. Every reasonable precaution must be taken in this area. And I think that we would want to error on the side of longer hospitalization than shorter hospitalization."

In view of this testimony, the trial court's finding is not to be rejected as lacking evidentiary support.

Citing *Kent v. United States*, 130 U.S. App.D.C. 343, 401 F.2d 408 (1968), in which the waiver of jurisdiction by the district court upon the remand of Kent was reversed on the grounds that the district court failed to give adequate consideration to the possibility of civil commitment, appellant here asserts that the trial court failed to give adequate consideration to that possibility. *Kent* involved a psychotic youth. There was no evidence in this case that appellant was psychotic. The decision of the District of Columbia Court of Appeals in *Kent* is wholly unpersuasive as a basis for error on the part of the juvenile court in this case.

 Appellant asserts that the trial court made no finding as to the suitability or unsuitability of the juvenile law process for the rehabilitation of appellant. Such an argument ignores the necessary import of the trial court's findings. The fact that appellant had not previously been the subject of juvenile court action did not preclude the finding by the trial court of the unsuitability of retention of juvenile jurisdiction. Unfortunately juvenile courts are frequently presented with cases where the entire gamut of the facilities of that institution have been made available to a child, without beneficial results. In such a case the futility of further efforts within the juvenile system becomes an obvious factor in that court's relinquishment of jurisdiction. However, waiver is not to be conditioned upon lack of success in the juvenile

process, when the court, as it did in this case, concludes that the relevant factors, properly found and considered, lead to the conclusion that the juvenile system is not the proper forum for the handling of the particular youth involved.

Upon a review of the juvenile court's findings in the light of the evidence, this court cannot say that its conclusion to waive jurisdiction amounted to an abuse of discretion and no reversible error may now be predicated upon the action of that court.

## II

### Suppression of Confessions

#### A

#### Confession to Officers

When the sheriff of Nodaway County and his deputy and members of the Missouri State Highway Patrol arrived at the Merrigan residence following the discovery of the bodies of the four members of the family, they interrogated neighbors and others in an effort to determine who might have committed the offenses. Information obtained by the officers led them to Benedict Kemper. At around 11:30 P.M. on October 11, the sheriff called the Fourth Circuit Juvenile Officer, Mr. Chamberlain, at his home in Rock Port and asked him to come to Conception. The sheriff told Chamberlain they had four murders on their hands and wanted to question a juvenile. Chamberlain met county and state officers at the Merrigan house and went with them to the Kemper residence, where they arrived at around 1:00 A.M.

Mr. and Mrs. Kemper and a daughter were at the house when the officers arrived. Chamberlain, the sheriff and Sergeant Hollingsworth of the Highway Patrol went to Benedict's bedroom on the second floor of the house. The officers awakened Benedict and asked him to dress and come downstairs with them. He did so. Benedict, Sergeant Rhoades of the Highway Patrol, Sheriff Middleton and Chamberlain sat around a dining room table. Mr. and Mrs. Kemper and their daughter were also in the room.

According to Chamberlain, he read the *Miranda* warnings from a card and handed the card to Benedict and asked him to read it. He asked Benedict whether he understood the warnings. Benedict indicated that he did and Chamberlain asked him to initial the card and he did so. Chamberlain said that they told Ben "why we were there." Chamberlain began the questioning.

According to Sergeant Rhoades, Chamberlain asked several questions which produced no incriminating response. Rhoades then took over the questioning and began by pointing out that a .22 shell casing had been found at the scene of the killings and that the Patrol could identify the weapon from which the shells had been fired. (Mr. Kemper had given the officers a .22 caliber rifle with which Benedict hunted when they came to the house.) According to Rhoades, at around this juncture Benedict, by a nod of his head, indicated his involvement in the affair. Rhoades noted a reluctance on the part of Benedict to speak and Rhoades asked whether he would like his parents to leave the room. Benedict gave an affirmative response and Rhoades asked the father, mother and daughter to leave the room. They went to a porch where the door was closed and they could not hear any further interrogation.

Further interrogation produced details of the event. After approximately 30 minutes of questioning, the interrogation ceased. The sheriff placed Benedict under arrest and took him to the county jail. No written statement was obtained.

A motion to suppress the statement was filed in the circuit court. A hearing was held on the motion. The trial court concluded that Chamberlain would not be permitted to testify to any statement made to him because such statement was used in the juvenile court proceedings and was thus made inadmissible in the criminal proceedings by § 211.271, RSMo 1969. The trial court also suppressed the use in evidence of a sheath knife which Chamberlain obtained in the course of the interrogation of appel-

lant and some items of clothing which Chamberlain had received from appellant's mother. The trial court held that Sheriff Middleton and Sergeant Rhoades would be permitted to testify to statements made to them. The court made a *Jackson v. Denno* finding as to the voluntariness of the statement and concluded that it was admissible.

Sergeant Rhoades testified over objection at the trial to the interrogation of appellant and to the statement of appellant admitting the killings and providing details of the occurrence.

On this appeal, the use of the appellant's admissions is attacked as erroneous on numerous grounds. One ground, that the admissions were given to the juvenile officer, is meritorious. Having reached such conclusion, the other grounds of objection need not be considered.

Section 211.271(3), RSMo 1969, provides:

"After a child is taken into custody as provided in section 211.131, all admissions, confessions and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."

This provision has been construed and applied in three recent decisions of the Supreme Court en banc. In *State v. Wright*, 515 S.W.2d 421 (Mo. banc 1974), a juvenile suspected of robbery and murder was in juvenile custody. Police questioned the defendant at the juvenile court in the presence of a deputy juvenile officer and the defendant's mother. The juvenile officer informed defendant of his constitutional rights, advised him that because of his previous juvenile record he would probably be certified to stand trial as an adult and that he might receive a death sentence on such a trial. The police officers then took over the questioning and obtained a confession which was subsequently used in defendant's criminal trial which resulted in a conviction. In rejecting the contention that the state-

ment was made to a juvenile officer within the meaning of § 211.271(3), the court held (515 S.W.2d 430):

" * * * The mere presence of the juvenile officer to warn the youth of his rights and to make sure that they were accorded to him, when all the facts and circumstances are considered, did not make the confession to the police officer a statement to the juvenile officer."

The court stated the applicable rule to be " * * * that if, after he has been granted his federal constitutional Fifth and Sixth Amendment rights, a juvenile subject to jurisdiction of the juvenile court makes a voluntary statement to someone other than a juvenile officer or other juvenile court personnel, and if it is made clear to the juvenile that criminal responsibility can result from any statement he makes and that the questioning authorities are operating as his adversaries rather than his friends, such statements are admissible in evidence against the juvenile in a criminal trial."

That rule was applied in *State v. Rone*, 515 S.W.2d 438 (Mo. banc 1974). There a juvenile robbery suspect was arrested by police, turned over to juvenile authorities and returned to the police for questioning in the presence of a deputy juvenile officer. The police interrogation resulted in a confession. In rejecting the argument based on § 211.271(3), the court stated (515 S.W.2d 441):

"Applying [the *Wright*] rule, we note that prior to interrogation defendant was given a Miranda warning which included information that any statement given could be used against him in court. A deputy juvenile officer was present as an observer during all of the interrogation. Defendant was interrogated in an adversary situation by a person he knew to be a police officer and the statement made was to that officer, not to the bystander juvenile officer. Defendant makes no complaint that there was any coercion or any mistreatment. In the hearing on the admissibility of the confession, he stated that his confession was voluntary. In that testimony he recognized

that anything he said could be used against him in any subsequent proceedings in court. We conclude and hold that defendant's confession was admissible under the rule announced in *Wright*."

In *State v. McMillian*, 514 S.W.2d 528 (Mo. banc 1974), the *Wright* rule resulted in the conclusion that a statement in response to police interrogation, made after a juvenile officer had given an explanation of rights, referring only to proceedings in the juvenile court, was inadmissible because the youth had not been adequately warned of the possible use of the statement in a criminal prosecution as an adult.

■■■ The interrogation in this case occurred before these decisions and the officers involved did not have the benefit of the guidelines which such decisions prescribed. Essentially those guidelines require nonparticipation by the juvenile officer in the questioning process, beyond an explanation of his rights to the juvenile and a showing that the juvenile was aware of the consequences of his making a statement insofar as criminal responsibility is concerned.

■■■ The conduct of the questioning in this case did not meet those requirements. There is no question that the juvenile officer went beyond an explanation of appellant's rights and participated actively in the interrogation. It is clear that the juvenile officer opened the interrogation with questions designed to provide answers linking appellant with the offenses. The state contends that the juvenile officer's questions produced no incriminating answers and that the damaging responses were to Sergeant Rhoades's questions. That reasoning, however, misses the point of the *Wright* rule which requires the juvenile officer to refrain from participating in the questioning if the interrogation is to be a police as distinguished from a juvenile interrogation. In this case, for instance, the testimony of the juvenile officer and of Sergeant Rhoades is at odds as to the extent of the former's participation. According to Chamberlain he "principally" asked the questions. He also said: "I don't think any of us ever ceased asking questions." He stated that

after Sergeant Rhoades asked several questions, he and Sheriff Middleton asked some. Rhoades testified that Chamberlain's questioning ceased before incriminating replies were received from appellant, but Chamberlain's testimony that he never stopped questioning would have to be ignored if Rhoades's recollection is to be relied upon. As long as the juvenile officer participates in interrogation, there cannot exist the adversary atmosphere required by *Wright* to make juvenile confessions admissible in criminal proceedings, under § 211.271(3).

Another problem here is that the evidence did not show that it was made clear to appellant that criminal responsibility might result from any statement he made. There was no testimony of any direct warning to that effect. The state relies upon the presence of police officers who were either known to or introduced to appellant as such. However, this case presents an unusual situation in that, only some 12 hours before, the juvenile had been interviewed by the juvenile officer, in the company of a deputy sheriff, in what appears to have been a meeting to provide the basis of handling of appellant within the juvenile system. In such circumstances, reliance upon appearance alone is not a sufficient compliance with the *Wright* requirement and the particular circumstances distinguish this case from *Rone*, where the appearances were held sufficient to meet the *Wright* requirement.

B

### Statement to Jail Inmate

On April 2, 1973, the Judge of the Juvenile Division of the Nodaway County Circuit Court entered an order for the change of the place of detention of appellant from the Nodaway County jail to the Andrew County jail. This order was made because of the inadequacy of the Nodaway County facility for the detention of juveniles and the superior facilities of the Andrew County jail.

On April 3, 1973, appellant was taken to the Andrew County jail. He was placed in

the security section on the first floor of the jail. An iron door which might have been closed and would have separated the security area from the rest of the jail remained open during the period here pertinent.

On October 12, 1972, Raleigh Lee Landess, 27 years of age, entered the Andrew County jail to serve a six-month sentence for assault. Before appellant entered the jail, Landess had slept in the security section, but when Kemper was placed there, Landess slept in the so-called "Juvenile Section," on the first floor of the jail.

Landess was discharged from imprisonment on either April 10 or 12, 1973. While appellant was in the jail, Landess "had the run" of the place. He could not enter the security section but from the outside of that area he could see and talk with appellant. He and appellant spent several hours every day playing cards through the bars. Landess brought Kemper his three daily meals on most of the occasions during the 9 or 10 days both were in the jail.

A short time after Kemper was placed in the jail, Landess went to the security area and asked Kemper if he wanted a cup of coffee. Kemper said he did and Landess brought it to him. The two started playing cards and talking. Kemper asked Landess if he knew what he was in there for and Landess said "Yes" and asked, "Well, did you do it, are you guilty" and Kemper said he was. After Landess satisfied Kemper that he was not a police "plant," Kemper told him the details of the affair. According to Landess, he subsequently discussed the case with Kemper on numerous occasions and discussed "bits and pieces" of it, but Kemper changed only his first story that he walked in the front door of the Merrigan house and said he hid in the basement and came up a different way.

According to Landess, the Andrew County sheriff asked him on some occasion whether Kemper had told him anything and Landess made no reply.

Landess was discharged from jail at 9:00 A.M., April 10, 1973, according to the sheriff (Landess said the date was April 12, 1973.) When he was discharged, he went to the sheriff's office. Sergeant Rhoades was in the sheriff's office and he and the sheriff asked him whether Kemper had told him anything. Landess's father had come to take him from the jail and he asked his father whether he should tell the officers anything. His father advised him to do so and Landess told them what Kemper had said to him. Sergeant Rhoades reduced the statement to writing and Landess signed it and swore to its truth before a notary public.

A motion to suppress the statement and testimony of Landess was filed on behalf of appellant, based upon the fact that, during the period of his confinement while Landess was in the jail, he was permitted to be in contact with Kemper and Kemper was not separated from adult prisoners as required by § 211.151, subd. 1(4), RSMo 1969. The motion also alleged a violation of right to assistance of counsel and violation of the privilege against self-incrimination.

A hearing was held on the motion and the motion overruled. Landess testified at the trial and related the details of the incident as Kemper told them to him. Appellant now contends that the admissions made to Landess were the "fruit" of an illegal detention and that their admission in evidence violated appellant's rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Art. I, §§ 10, 18(a) and 19 of the Constitution of Missouri, 1945.

Section 211.331 2., RSMo 1969 (applicable under § 211.341 1. to the detention facilities here provided) states:

"The place of detention shall be so located and arranged that the child being detained does not come in contact, at any time or in any manner, with adults convicted or under arrest, and the care of children in detention shall approximate as closely as possible the care of children in good homes."

There can be no question that this statute was not complied with as appellant obviously came into contact with Landess, a convicted adult. The question is the

effect of such violation upon the admissibility of the admissions made to Landess. Based primarily upon the decisions in *State v. Arbeiter*, 40& S.W.2d 26 (Mo.1966), and *Hamby v. State*, 454 S.W.2d 894 (Mo. banc 1970), appellant would fashion an exclusionary rule applicable to all statements to whomever made by a juvenile, illegally detained. *Arbeiter* and *Hamby* did hold that statements of juveniles to police, in response to police questioning at a time when the police had failed to deliver the juvenile to juvenile officials, as required by § 211.-061, RSMo 1969, may not be used against a juvenile in criminal proceedings. *Hamby* also extended such exclusionary rule to a statement to police while a juvenile is imprisoned in jail, without the order of the juvenile court, as required by §§ 211.141 and 211.151, RSMo 1969. These exclusionary rules are designed to prevent police from taking advantage of a situation created by their failure to comply with the law.

■ The basic purpose behind the requirement of confinement of juveniles apart from adult prisoners is to protect juveniles from the adverse influence which adult prisoners might have upon the juveniles. It was intended to inhibit communication from an adult to a juvenile. To impose an exclusionary rule in a situation such as this would not further the essential object of the statute.

■ Insofar as the constitutional guaranties relied upon by appellant are concerned, it is well settled that the *Miranda* decision, which has as its basis the constitutional guaranties here invoked, does not apply to volunteered statements of a defendant while in police custody. See *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Gregg v. State*, 446 S.W.2d 630, 632[12] (Mo.1969); *State v. Wintjen*, 522 S.W.2d 628, 630[6] (Mo.App. 1975).

The trial court did not err in overruling the motion to suppress the statements made to Landess or in allowing Landess to testify at trial to the statements.

In view of the trial error subsequently considered, the state's contention that the admission of Rhoades's testimony regarding the statement of appellant is, in view of the admissibility of Landess's statement, harmless error, will not be considered. Of course, in the event of a new trial, the testimony of Rhoades (or Sheriff Middleton) to the statement should not be introduced.

### III
### Alleged Trial Errors
### A
### Failure to Instruct on Second Degree Murder

■ As above stated, Doctor Gaitonde testified that appellant has an "explosive personality." He read to the jury from the Diagnostic and Statistical Manual of Mental Disorder, 2d Ed., published by the American Psychiatric Association, concerning this condition:

" * * * 'this behavior pattern is characterized by gross outburst of rage or of verbal or physical aggressiveness. These outbursts are strikenly (sic) different from the patient's usual behavior, and he may be regretful and repentant for them. These patients are generally excitable, aggressive and over-responsive under mental pressure. It is the intensity of the outburst and the individual's inability to control them which distinguishes this group.' "

Further questions by appellant's counsel and answers received from Doctor Gaitonde were as follows:

"To what extent did the condition which you have diagnosed here for us affect the ability of Benny Kemper to deliberate on October 10th, 1972 at the time of the alleged offense?

"A. I think to a very great degree. You see, as soon as he felt that the Merrigan family, the Merrigan children, had done insulted him, had been teasing him, and no one was helping him out, nobody was taking care of them (sic), he had no place to go for comfort, and then he decided on October 10, around 7 o'clock or so, that he was going

to take the law into his hands. From that point on, in my opinion, the patient lacked substantial capacity to bring his conduct in conformity with the law.

"Q. Could he deliberate?

"A. He could not."

At the conclusion of the testimony, defense counsel requested the court to instruct on second degree murder as to all four counts of the information. The court denied such request and no instructions on second degree murder were given. Appellant now contends that the failure to instruct on murder in the second degree was error.

Subsequent to the trial of this case, the Supreme Court of Missouri en banc, in *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974), held that Section 552.030(3)(1) amounted to a rule of evidence making admissible evidence that, at the time of an offense, a defendant had a mental disease or defect which precluded his having a state of mind which is an element of the offense charged. In that case a defendant charged with murder in the first degree was found guilty of murder in the second degree. He had pleaded not guilty and not guilty by reason of mental defect. Testimony offered on behalf of the defendant was that he had a severe depression, a mental disease or defect, and that as a result he was unable to premeditate. On appeal, he contended that in view of this evidence, the court should have instructed the jury on manslaughter. The court sustained this contention, holding that, under Section 552.-030(3)(1), the jury was entitled to consider evidence on the absence of premeditation due to mental disease or defect the same as it would have been entitled to consider other evidence bearing upon that issue.

That case is controlling of the issue here raised. The presence of deliberation is the element which distinguishes murder in the first degree from murder in the second degree. As in *Anderson*, when evidence was presented that the appellant's mental disease or defect prevented the mental process required for the existence of that element of the offense, the jury was enti-

tled to consider that evidence and determine whether or not it called for a finding that the offense was murder in the second degree.

The state would avoid the effect of *Anderson* on the theory by which the court in that case distinguished *State v. Glenn*, 429 S.W.2d 225 (Mo. banc 1968). *Glenn* was a felony murder case in which no error was found in the refusal of a second degree murder instruction to which defendant claimed he was entitled under Section 552.-030(3)(1) by reason of evidence as to his mental incapacity. Apparently respondent's view of the effect of *Glenn* as recognized in *Anderson* is that in the case of felony murder, when the mental elements embodied in conventional murder in the first degree are supplied by proof of the underlying felony, Section 552.030(3)(1) may not be involved. The theory of the respondent here is that this case involved murder "by lying in wait" under Section 559.010 and that proof of the "lying in wait" supplied the elements of premeditation and deliberation and made the offense first degree murder or no offense, so that there was no error in failing to instruct on murder in the second degree.

The most obvious defect in the state's argument is that this case was charged and submitted as conventional murder in the first degree. There is no need to consider the meaning and effect of "lying in wait" as used in Section 559.010. Compare *State v. Kilgore*, 70 Mo. 546, 556 (1879); *State v. Daly*, 210 Mo. 664, 109 S.W. 53, 57 (1908), and *State v. Payton*, 90 Mo. 220, 2 S.W. 394, 396 (1886). This case was not submitted on any theory of "lying in wait."

The defendant having adduced evidence that his mental state did not admit of his having deliberated before the shootings, the court was, under *State v. Anderson*, supra, required to submit to the jury for its consideration an instruction on murder in the second degree, the offense for which appellant might have been found guilty had the jury considered and accepted his evidence on the issue of deliberation.

## B

### Motion for Acquittal at End of Evidence

Appellant's argument that his motion for acquittal at the end of all of the evidence should have been sustained is predicated upon the inadmissibility of appellant's statements, testified to by Sergeant Rhoades and Raleigh Lee Landess. In view of the conclusion that the statement to Landess was admissible, this contention is without merit.

## C

### Examination of Psychiatric Witnesses

In the direct examination at trial Doctor Gaitonde expressed the opinion that appellant was suffering from emotional illness or defect on October 10, 1972, and that, although he appreciated the nature, the quality and wrongfulness of his conduct, he was incapable of conforming his conduct to the requirements of the law. His diagnosis was that appellant had an explosive personality. When Doctor Gaitonde started to testify about the necessity or desirability of treatment for the condition, an objection on the part of the state was sustained. Defense counsel made an offer to prove by Doctor Gaitonde that the condition diagnosed by him was treatable, that there are specific types of clinical treatment available in a clinical facility which would lead toward improvement of the condition. The offer of proof was rejected. The defendant also sought to prove that, in his report to the magistrate court on appellant's mental state, Doctor Gaitonde had recommended that defendant be treated in a hospital. This offer of proof was also rejected.

In rebuttal, the state offered the testimony of Doctor Jack and Doctor Jackson of the staff of the Fulton State Hospital. Both testified to the examination and evaluation of appellant at that institution and both concluded that appellant had no mental disease or defect which prevented his conforming his behavior to the requirements of the law. Both witnesses stated that appellant had "explosive tendencies" but they were of the opinion that his abnor-

mality did not rise to the status of a mental disease or defect. In the cross-examination of both of these witnesses, defense counsel sought to show that appellant's condition as found by them was subject to treatment. Offers of proof to such effect as to both witnesses were refused by the court.

▮▮▮▮ Appellant here assigned separately error in the court's ruling with respect to the testimony of his witness and respondent's witnesses. As to the former, he contends that he was denied the opportunity of submitting an important fact concerning his mental condition, i. e., that his condition could be improved by treatment in a proper setting. As to the latter, he contends that he was not permitted to impeach the testimony of the state's witnesses by showing that appellant's mental condition was treatable. Thus the essence of appellant's position is the same with respect to both of his assignments of error, i. e., that evidence that appellant's mental condition was subject to treatment bore upon the question of whether or not he was suffering from a mental disease or defect which excluded criminal responsibility.

Appellant offers no authority, either legal or medical, in support of this proposition. Section 552.010, RSMo 1969, in defining "mental disease or defect" for purposes of Chapter 552, makes no reference to the possibility of treatment as a factor to be considered in the determination required to be made in order to excuse criminal responsibility. The express exclusion of certain types of mental illness or defects would appear to exclude such element in a determination under Chapter 552. In the absence of some logical relevance to the testimony which appellant sought to adduce, its exclusion by the trial court cannot have been error.

Appellant also contends that, in his opening statement, the prosecutor had referred to defendant's mental condition as "not a treatable thing." Appellant contends that this put the subject in issue. As the trial court noted when this argument was advanced there, the court had instructed the jury that what the lawyers said was not

evidence. Furthermore, a statement by counsel in his opening statement does not, standing alone, give rise to a factual issue. *State v. Hoelzer*, 493 S.W.2d 703, 705–706[2–4] (Mo.App.1973); *United States v. Tomaiolo*, 249 F.2d 683, 689 (2d Cir. 1957). No error may be predicated on this theory.

Other matters assigned as trial error will not likely recur upon a new trial and will not be considered.

For the error in failing to instruct on murder in the second degree, the judgment is reversed and the cause remanded.

Reversed and remanded.

All concur.