STATE of Missouri, Respondent,

v.

Albert A. ABRAM, Appellant.

No. 59376.

Supreme Court of Missouri,
En Banc.

June 14, 1976.

James L. McMullin, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Timothy J. Verhagen, Asst. Atty. Gen., Jefferson City, for respondent.

BARDGETT, Judge.

The defendant was convicted by a jury of the second-degree murder of his infant daughter, Carla, and was sentenced to a term of twelve years. Defendant appealed to the Missouri court of appeals, Kansas City district. The conviction was reversed and the cause remanded for new trial for failure of the trial court to submit an instruction on manslaughter. On application of respondent after opinion in the court of appeals, we transferred the case to this

court pursuant to Art. V, sec. 10, Mo.Const. Portions of the court of appeals opinion are utilized without use of quotation marks.

█ The contention is made that the evidence does not support the conviction. We disagree and conclude that the evidence was sufficient to permit a jury to find the defendant guilty of murder in the second degree.

It was the testimony of Dr. William Bonner that on May 9, 1974, about 8:15 p. m., Carla was brought comatose into the emergency room of the Kansas City College of Osteopathy. The body of the child was marked with bruises, abrasions, and contusions about the face, arms, chest, but most prominently around the eyes. The symmetrical pattern and number of bruises led the physician to conclude that they were not the result of accident or fall, but rather recently inflicted in a beating by a blunt object, perhaps a fist, forcefully applied. The efforts by Dr. Bonner to save the life of the child were unavailing and, within forty-five minutes, she died. The autopsy was performed on the following morning by Dr. Bonita Peterson, the medical examiner for the county. Her examination revealed that the two-year-nine-month-old victim had been brutally beaten and bruised about the entire body. Death had resulted from subdural bleeding from blows of recent occurrence to the skull not more than twenty-four hours old. The injuries were not of the kind caused by fall or accident.

The homicide detective, Michael Ferguson, interviewed the defendant on the morning following the occurrence. The defendant, after *Miranda* warnings, signed an interrogation waiver, and orally admitted that the previous evening he had spanked the child several times with a belt because she had wet herself. The past week, the child had been unusually naughty so he had struck her more than usual during that time. That week the mother had also spanked the child.

It was the testimony of Vincent Lee that he claimed the child Carla as his daughter. She was born September 27, 1971. He had consorted with the mother for over a year before her marriage to the defendant. The witness stated that after the child died he and his brother were walking near his place of work when the defendant encountered them and began to converse with them. It was then, Lee said, that the defendant told him: "Yes, I heard that you were looking for me . . . Yes, I killed your daughter, and I will kill you too, and what are you going to do about it?" On cross-examination, the witness conceded that he did not inform the police either of the confession by defendant nor of the threat to his life.

The brother of the mother of the child, George Murphy, testified that he talked to the defendant by telephone the evening that Carla died at which time the defendant told him he was babysitting with the child while his wife Janie was at the hairdresser.

Testimony was also given by Elmer Cann, common-law husband of Janie's sister. He had twice conversed by telephone with the defendant about the death of the child. On the first occasion, the defendant called him from jail and said he was sorry about what happened, but wanted to talk to his wife Janie to arrange bail. On the second occasion, he said he was sorry he had killed Carla. On cross-examination, he admitted he had never made a formal report of this confession to the police.

Officer Jackson of the Kansas City police department testified that he took the defendant into custody at the hospital immediately after the death of the child. The defendant (then in an intoxicated condition) there told him that it was good riddance that the child had died. The officer testified, also, that he questioned the mother of the child who told several different stories how the child had been injured.

The evidence was sufficient to permit a jury finding that defendant intentionally caused the death of Carla by striking her; that he did so with the intent to kill her; and that there were no acts on Carla's part that suddenly provoked the assault. The point is overruled.

█ MAI–CR 6.06 was used to submit the offense of conventional murder second

degree. The defendant complains that, proof of murder second degree having been shown, he was entitled as a matter of law to submission of manslaughter under *State v. Stapleton,* 518 S.W.2d 292 (Mo. banc 1975). The state argues that the defendant's reading of *Stapleton* is valid only where, as in that case, the proof is circumstantial or where there is evidence of a state of mind which mitigates the offense from murder to manslaughter. This is a direct evidence case.

The court of appeals decided this case on November 3, 1975. On November 25, 1975, this court decided *State v. Mudgett,* 531 S.W.2d 275 (Mo. banc 1975), and denied defendant-Mudgett's motion for rehearing on January 12, 1976. The instant case was ordered transferred on January 7, 1976. In *Mudgett* the defendant contended the trial court erred in failing to submit manslaughter to the jury. This court held the trial court did not err in failing to instruct on manslaughter in *Mudgett.* As to this issue, there is no significant difference between *Mudgett* and the instant case and there is nothing to be gained by restating the rationale of *Mudgett* here. See *State v. Mudgett, supra,* at 280. The point is overruled.

The transcript shows that after the jury had been deliberating for about three and one-half hours the jury sent a note to the judge which said: ". . . is it possible for the jury to receive a definition of the word 'intended' as it is used in the second part of the statement of charges?" As a result of that note the trial court gave the jury instruction No. 11 which reads as follows: "One 'intends' a result if he or she has in mind the result as a design or purpose; or if he or she knows all pertinent facts, and reasonably expects the result or consequence to flow from his or her actions or inactions."

Defendant objected to instruction 11 stating that MAI–CR make the matters submitted in instructions as clear as they can be and that the court ought not to give an instruction giving its (the court's) own definition of what the word "intends" means.

This case was tried in September 1974 which was after the effective date of MAI–CR. Instruction 11 is not an MAI–CR. One of the purposes of formulating pattern instructions was to discontinue the use of archaic language and the use of words which might not be readily understood by ordinary lay citizens who sit on juries throughout this state. Words and phrases were selected for use which have a readily understandable meaning. Generally, these approved instructions do not set forth the elements of an offense and then define each element as did most instructions in criminal cases prior to MAI–CR.

In a number of cases defendants have contended that the trial court erred in failing to define a term used in instructions. For example, in *State v. Goodman,* 490 S.W.2d 86, 87 (Mo.1973), defendant contended that the words "great bodily harm" should have been defined. The court held that that phrase was in the same category as "reasonable doubt" and held that "reasonable doubt is reasonable doubt, and that is about all that can be said in regard to it", citing *State v. Talmage,* 107 Mo. 543, 17 S.W. 990 (1891). In so ruling the court said, 490 S.W.2d at 87: "It has long been the rule that words of common usage which are generally understood, when used in a charge to the jury, need not be defined in the absence of a request [citing cases], and not always when requested. *State v. Taylor,* Mo., 486 S.W.2d 239."

In *State v. Taylor, supra,* the contention was again made that the court erred in refusing to define reasonable doubt. The court again held that the rule in this state that such a definition is not required and citing *State v. Robinson,* 117 Mo. 649, 23 S.W. 1066 (1893), said, "it is difficult to explain simple terms like 'reasonable doubt' so as to make them plainer."

Prior to MAI–CR, various terms had been used in instructions to direct the jury's attention to what they must find the defendant's state of mind to have been in order to convict him of a crime requiring specific intent. Sometimes the word "wilfully" was used and when "wilfully" was defined it

was said to mean "intentionally" or "knowingly" and not accidentally. In a publication by The Missouri Bar entitled, "The Missouri Bar Committee Comments on Missouri Approved Criminal Instructions", in the chapter on murder, at p. 18, it is said: "The word 'intentionally' necessarily includes and is broader than the term 'premeditatedly', and 'wilfully' and 'intentionally' are interchangeable. *State v. Foster*, 355 Mo. 577, 197 S.W.2d 313 (1946). The word 'intentionally' has the advantage of not needing to be explained or defined to the jury. In keeping with the concept that instructions should be framed in the language most comprehensible to the layman, MAI–CR 6.02 and 6.06 do not require any finding on the issue of 'premeditation'. 'Premeditation' is necessarily found when the jury finds that the defendant intended to cause the death of the deceased."

■ It is quite clear that had the defendant requested an instruction defining "intends", the trial court would not have erred in refusing to give it, as such refusal would have been in accordance with the concept of MAI–CR and the rulings in earlier cases. The words "intends" or "intentionally" are very ordinary terms and admit of no confusion with respect to their meaning. When further definition of such words is undertaken, it will result in a myriad of instructions formulated by various lawyers or judges according to their thoughts at the moment and will serve to confuse rather than clarify. Some will define a term negatively—what it does not mean, and others affirmatively—what it does mean. This is to be avoided. If experience indicates that it would be helpful for particular words or terms to be defined, lawyers and judges may, and are encouraged to suggest such changes. See MAI–CR, p. xx. Unless and until such changes are made and approved, instructions such as instruction 11 in this case should not be given.

■ It was error to give instruction 11 and we proceed, pursuant to Rule 20.02(e) to determine its prejudicial effect. Defendant, while complaining thereof, does not spell out wherein the instruction incorrectly defined "intended". We conclude and hold that it was not substantively erroneous and that prejudice to defendant did not result therefrom. The point is overruled.

■ Respondent points out that defendant has failed to set forth instruction 11 in his brief in violation of Rule 84.04(e) when the giving or refusal to give a particular instruction is complained of as being error. The rule requires that the instruction be set out in the brief. This is not an idle requirement. Each judge of appellate courts receives copies of the parties' briefs but does not receive a copy of the transcript. It is, therefore, necessary that the instruction complained about be set forth in the brief in order that the judges will be able to readily relate the points and the argument to the specific instruction about which complaint is made.

■ Defendant contends the court erred in failing to grant a mistrial when witness Vincent Lee testified the defendant threatened to kill him on the ground that such testimony constituted evidence of another crime that defendant was not charged nor on trial for and which prejudiced and inflamed the jury against him.

During the direct examination of witness Lee by the prosecuting attorney, the following occurred:

"Q. Tell the Court and the jury what this defendant said to you when he saw you?

A. Well, I made him stop, and he told me, 'Yes, I heard that you were looking for me.' Just then my brother grabbed me by my arm, and he said, 'Yes, I killed your daughter, and I will kill you too, and what are you going to do about it.'

MR. McMULLIN: Excuse me. Do you want to come up?

(Whereupon, the following proceedings were had in the presence, but out of the hearing, of the jury:)

MR. McMULLIN: Your Honor, at this time, I must respectfully move for mistrial. If I heard the witness correctly, he said in response to the prosecutor's question,

not only that the defendant said he killed the girl, that he ws going to kill him too, and what are you going to do about it. Now, I believe, under the cases, and if you want them, I will get them for you pretty quick, that is evidence of other alleged crimes for which he is not on trial, and I must respectfully move for a mistrial.

THE COURT: Motion is denied."

The prosecutor made no further reference to the alleged threat. On cross-examination defense counsel examined the witness at length about the "threat" mentioned supra. The only relief requested was a mistrial. The granting or refusal of a mistrial is largely within the discretion of the trial court. The court holds that the refusal to grant the requested mistrial was not an abuse of discretion.

The judgment is affirmed.

MORGAN, HOLMAN, HENLEY, FINCH and DONNELLY, JJ., concur.

SEILER, C. J., concurs under the compulsion of State v. Mudgett, 531 S.W.2d 275 (Mo. banc 1975).