**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Kenneth Edward TATE, Jr.,**
**Defendant-Appellant.**

**No. 43738.**

Missouri Court of Appeals,
Eastern District,
Division Four.

May 4, 1982.

Motion for Rehearing and/or Transfer
Denied June 18, 1982.

Application to Transfer Denied
Sept. 13, 1982.

Leonard Frankel, Clayton, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, M. Edward Williams, Pros. Atty., Hillsboro, for plaintiff-respondent.

SMITH, Presiding Judge.

Defendant appeals from his conviction by a jury of second degree murder and the resultant sentence of twenty-five years imprisonment.[1] We affirm.

The crime apparently occurred on May 27, 1980. Defendant reached his sixteenth birthday one week later. The victim was a 13-year-old girl, Lisa Harris, a neighbor of defendant. Lisa was missing from approximately 5:00 p. m. May 27th until her body was found the next day at 11: a. m. in a wooded area near the Big River in the neighborhood where she and defendant resided. Cause of death was "severe brain damage caused by external trauma." Lisa had sustained multiple skull fractures and severe bruises to her shoulders, neck and face as a result of blows from a blunt instrument, probably a tree limb found bloody and broken in two near her body. The skull fractures were caused either by multiple blows or by one very forceful blow. The pathologist opined that death would have occurred within several minutes. There was no evidence of sexual assault or intercourse, but one breast of the victim was exposed. Near Lisa's body was a bicycle which she had been riding when last seen. On the handlebars of the bicycle were defendant's palm prints. Time of death was most imprecise and estimated at anywhere from four to more than twenty hours prior to the autopsy, performed on the afternoon of May 28. There was considerable evidence that Lisa and defendant were seen riding bicycles together between 5 and 6 p. m. on May 27th near the place where Lisa's body was found. Defendant, who had been to the Harris home at least twice in the late afternoon on the 27th, returned a third time at about 6 p. m. and was found hiding under the Harris boat dock at 6:15 p. m. or later. Testimony was presented from two men who had been prisoners in the Jefferson County jail at the

---

1. The jury recommended a sentence of thirty-five years, but the court, exercising clemency, imposed twenty-five.

same time defendant had been confined, that defendant told each of them (on separate occasions) that he had killed Lisa by striking her with a tree branch. The reason given for killing her was that defendant had attempted to rape her and was afraid she would tell her father of whom defendant was fearful.[2]

Defendant denied killing Lisa; admitted he had ridden with her briefly; explained the presence of the palm prints on the basis he grabbed the handlebars when Lisa lost control upon seeing a snake; testified when he left Lisa she was alive and well; and stated that he was under the boat dock to hide from his parents who would punish him for leaving home without permission and for swimming in the river. The remainder of the defendant's evidence, predominately from members of his family, was directed to establishing where defendant was before and after the time Lisa left her home to go riding.

■ On appeal defendant raises six claims of error. The first challenges the action of the Circuit Court of Jefferson County[3] in dismissing the juvenile petition against defendant to allow for trial as an adult, (Sec. 211.071, RSMo 1978, and Rule 118) and the denial by the trial court of defendant's motion to remand the case to juvenile court. Defendant does not dispute that he had an evidentiary hearing on the waiver of juvenile court jurisdiction, that he was represented by counsel at that hearing, and that he received a statement of reasons for the certification. These particular rights are protected by the constitutional principles of due process and right to counsel. See *Jefferson v. State*, 442 S.W.2d 6 (Mo.1969) [6]; *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). They are applicable to the Missouri waiver procedure. *State ex rel. T. J. H. v. Bills*, 504 S.W.2d 76 (Mo. banc 1974). Defendant contends, however, that the evidence at the hearing supported neither the decision to waive jurisdiction nor the reasons contained in the court's statement waiving jurisdiction thereby infringing defendant's right to due process.

Section 211.071, RSMo 1978, provides the statutory authority for dismissal of the juvenile proceeding to allow prosecution under the general law. That section authorizes such dismissal of a juvenile of the age of fourteen or older "[i]n the discretion of the judge of the juvenile court" if the judge after hearing finds the juvenile "is not a proper subject to be dealt with under the provisions" of the juvenile code. This general grant of authority contains no specific guidelines for exercise of the court's discretion. Rule 118.04 lists four non-exclusive factors to be considered by the juvenile court in determining whether a dismissal to allow prosecution under the general law should be made.[4] The comment to the rule indicates that the enumeration of these factors "is not intended to enlarge upon or modify the basic test of Sec. 211.071." The order of the juvenile court, stating its reasons for granting the dismissal, made a finding on each of the four factors. Defendant contends, however, that these generalized statements were not, in fact, supported by the record.

■ In reviewing defendant's contention we adhere to certain basic principles. The determination of the juvenile court is a discretionary one and only if we find an abuse of that discretion, under the totality

---

2. The witnesses testified that this fear was engendered, according to defendant, because Lisa's father had an artificial arm terminating in a "hook." Lisa's father had such a physical disability.

3. The crime occurred in Jefferson County. The trial was held in Cape Girardeau County following a change of venue.

4. Those factors are: "(1) whether the offense alleged involved viciousness, force or violence; and

(2) whether the offense alleged is part of a repetitive pattern of offenses which indicates that the juvenile may be beyond rehabilitation under the Juvenile Code; and

(3) the record of the juvenile; and

(4) the programs and facilities available to the juvenile courts."

of the circumstances, may we reverse. *In the Interest of A.D.R.*, 603 S.W.2d 575 (Mo. banc 1980) [6]; *State v. Kemper*, 535 S.W.2d 241 (Mo.App.1975) [7]. It is not the prerogative of the juvenile court to make a determination in the dismissal proceeding whether the juvenile is guilty of the offense charged. The court must review the evidence on the basis of the juvenile involved and the crime charged and determine whether if that juvenile is eventually found to have committed the crime he would be a fit subject to be dealt with under the juvenile code. *Richardson v. State*, 555 S.W.2d 83 (Mo.App.1977) [10, 11]. The quantum of the evidence pointing to the juvenile's guilt is of no concern to the determination to waive jurisdiction. While the fact that a serious crime is involved does not, in and of itself, require certification, (*T. J. H. v. Bills, supra*, [7]), the seriousness, and particularly the violent or vicious nature of the crime may constitute strong evidence that the juvenile is not a fit subject for the rehabilitative facilities of the juvenile court. *State v. Kemper, supra*, [8, 9]; Rule 118.04. The ultimate purpose of the transfer of a juvenile is to protect the public in those cases where rehabilitation within the juvenile court framework appears impossible. *State ex rel. Arbeiter v. Reagan*, 427 S.W.2d 371 (Mo. banc 1968) [4].

 Reviewing the evidence at the dismissal hearing, and even considering defendant's subsequent evidence at the hearing on the motion to remand, we find no abuse of discretion in the juvenile court's determination. Defendant's arguments to the contrary notwithstanding, the bludgeoning to death of a 13-year-old girl is a violent and vicious crime, the seriousness of which can hardly be disputed. It is strong evidence that the perpetrator constitutes a serious threat to society. The evidence established that the crime was unreported, and Lisa's body was found the day after she disappeared only after a search by police officials. The perpetrator of the murder did not seek help for the victim or come forward demonstrating remorse or contriteness over what had occurred. These are factors which may be considered in determining the potential for rehabilitation. Defendant had had several prior exposures to the juvenile system all of a relatively minor and inconclusive nature, but there had been no demonstrable success in getting him to conform his conduct to that which is socially and legally acceptable. A similar pattern of continuing school infractions was also before the court. A decision to waive juvenile jurisdiction is not dependent on extensive prior efforts by the juvenile court to rehabilitate the child. *State v. Kemper, supra*, [15]. The court found defendant to be a tall, well-developed almost 16-year-old, who was experienced and mature-appearing. We defer to that factual finding. Such finding is relevant to dismissal of the juvenile petition. *Coney v. State*, 491 S.W.2d 501 (Mo.1973) [14]. The Chief Deputy Juvenile Officer testified that in his opinion the only facility practically available for defendant, Missouri State Training School at Boonville, did not offer rehabilitative potential for this juvenile, in part because of lack of security at that facility. Lack of security where the perpetrator constitutes a threat to society is a valid consideration in determining whether adequate rehabilitative facilities are available to the juvenile court. *In the Interest of A.D.R., supra*, [7]; *State v. Kemper, supra*, [13]. While testifying to a particularly good facility in the State of Maine, defendant's expert admitted that such facility was probably not available for defendant and that practically the only facility for defendant would be Boonville. The expert disagreed with the Deputy Juvenile Officer on the rehabilitative potential of Boonville although not on the security. Part of defendant's disagreement with the juvenile court's conclusions regarding rehabilitation appears to hinge on the length of time available for such rehabilitation. Defendant contends the period was five years (until defendant reaches 21) while the state contends it is two years. The juvenile court retains jurisdiction until a child is 21 except when the child is committed to the Division of Youth Services. Sec. 211.041, RSMo 1978. The Division must release a child when he be-

comes eighteen. Sec. 219.021.1, RSMo 1978. The juvenile court may only regain jurisdiction from the Division if the Division so requests, Sec. 219.081, RSMo 1978, or if new jurisdictional facts arise after commitment. *Durant v. State*, 523 S.W.2d 837 (Mo.App. 1975) [1, 2]. We believe it reasonable for the juvenile court to conclude that from a practical standpoint only two years of rehabilitative confinement was available and that based upon the crime and defendant's past history such a period was not adequate to rehabilitate defendant and more important, to protect society from him. *In the Interest of A.D.R.*, 603 S.W.2d 575 (Mo. banc 1980) [8, 9]; *State ex rel. Arbeiter v. Reagan, supra*, [4]. We find no error in the juvenile court's action in dismissing the juvenile proceedings.

■ Defendant next takes issue with the trial court's action in sustaining challenges for cause of four veniremen. The contention raised is that the trial court sustained these challenges because the veniremen indicated they might be more lenient in assessing punishment because of defendant's age. Such basis would, defendant contends, be a systematic exclusion of a distinct class of individuals prohibited by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The most obvious difficulty with this argument is that it lacks record support. Before granting the challenges the trial court specifically stated that it did not believe that a venireman's inclination to leniency in punishment because of defendant's age was a basis for challenge for cause, and the court denied challenges for cause of several other veniremen who expressed a similar inclination toward leniency. The record reflects that each of the successfully challenged veniremen had expressed inclination of leniency because of defendant's age but their responses reflected additional grounds for challenge. One venireman expressed a hostility for police. Another stated that defendant's age would cause him difficulty in determining guilt or innocence, not just punishment. A third divulged a very recent hospitalization for bleeding ulcers. Given the nature and circumstances of the case and the lengthy hours of trial the trial court may have well been concerned about the effect of the trial on the venireman's health and his ability to complete his service. The fourth venireman indicated that because of his familiarity with prison conditions in Illinois he would have a problem in assessing a fair punishment against a youthful offender. Considering that the offense with which defendant was charged carried a minimum punishment of 10 years imprisonment, (Sec. 565.008.2, RSMo 1978) the venireman's concerns reflected not just a leniency toward punishment but an attitude which might affect his ability to make a finding of guilty. We find no abuse of the trial court's broad discretion in its actions in sustaining the challenges for cause. *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981) [6, 7]; *State v. Treadway*, 558 S.W.2d 646 (Mo. banc 1977) [1, 2]; *State v. Murphy*, 610 S.W.2d 382, 383 (Mo.App.1980) [12–16].

■ Defendant next challenges the trial court's action in admitting evidence regarding the ownership of a bicycle defendant was riding in the late afternoon on May 27. A description of that bike was first elicited by defendant during cross-examination of a prosecution witness. Subsequently both prosecution and defense asked witnesses to describe the bike. During cross-examination of one of defendant's sisters (Cathy) the prosecution elicited the fact that defendant had left home on foot. Questions followed as to whether defendant had his own bike (it was broken at the time) and where the family bicycles were on the day of the murder. During cross-examination of another sister (Vickie) the prosecution asked whose bike had been put into the rear of the Tate pick-up at the time defendant's mother took defendant home after he was found hiding under the Harris dock. Objection was made that the testimony was irrelevant. That objection was overruled. Over objection the prosecution asked if the witness knew what happened to the bike after they got home and if the witness knew that it was not defendant's bike. The defense thereafter elicited testimony from defendant and his mother that defendant had

found the bike in a field and that defendant's mother had returned it to that location the night of May 27. The next day the bike was gone. At defendant's request the trial court gave an instruction that the jury must not consider defendant's action in taking and using a bike which didn't belong to him in determining his guilt of the crime with which he was charged.

Defendant seeks reversal on the basis that the evidence was of the commission of a separate crime. Such evidence is not admissible unless it has a legitimate tendency to establish guilt of the charge for which defendant is being tried. *State v. Lasley*, 583 S.W.2d 511 (Mo. banc 1979) [6, 7]. We are not convinced that the evidence elicited by the prosecution indicated that defendant had committed a separate crime. It was not until defendant and his mother testified on direct examination that a separate crime surfaced and even that testimony only reflected that defendant had taken possession of what he thought was abandoned property. Furthermore, a large part of the state's evidence was an attempt to establish what defendant had been doing and where he was prior to and during the time when the crime was committed. He was seen to leave his home on foot at 4:30 p. m. Shortly thereafter he was seen on a bike and witnesses were asked to identify the defendant and describe what the bike looked like. There were no eyewitnesses to the crime, so it was important that the state present a clear picture of the circumstances to convince the jury that the state's witnesses had, in fact, seen the defendant on a bicycle with the victim that afternoon. How defendant, whose bike was broken and who left the house walking, obtained the bicycle was a relevant question. It was not until after the evidence objected to had been admitted that defendant took the stand and testified that he had in fact been riding a bike with Lisa that afternoon. We find no error in the admission of the evidence and in view of the cautionary instruction, no prejudice to defendant. *See State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304 (Mo. banc 1954); *State v. Barnett*, 611 S.W.2d 339 (Mo.App.1980); *State v. Neal*, 416 S.W.2d 120 (Mo.1967) [7, 8].

■ Defendant next contends that the trial court erred in refusing to permit him to present evidence that he was physically and verbally harassed while in the Jefferson County jail. The ostensible purpose of this evidence was to establish an animosity toward defendant by the jail personnel and prisoners which would establish a motive for the two inmates to testify to the alleged confessions of defendant. We find the relevance of this evidence tenuous at best. That relevance and probative value become even further attenuated in view of the fact that none of the alleged physical abuse and very little, if any, of the alleged verbal abuse occurred until sometime after the two prisoners, Boyer and Crutchfield, had reported defendant's admissions to the sheriff's department. The trial court has a "superior vantage for balancing the probative value and prejudicial effect" of evidence. *State v. Morris*, 585 S.W.2d 231 (Mo.App.1979) [1–4]. The trial court rejected the evidence on the basis that:

"All of the items, most of the items testified to by the defendant occurred after such statements were obtained by the law enforcement officials. Therefore, I find that the probative value is outweighed by the prejudicial effect resulting by the injection of a collateral issue and somewhat unfairly appealing to the emotional aspects of this case."

We find no abuse of discretion in refusing to allow this testimony. *State v. Clemmons*, 460 S.W.2d 541 (Mo.1970) [2, 3]; *State v. Morris, supra; State v. Walden*, 490 S.W.2d 391 (Mo.App.1973) [7].

■ Defendant next contends the evidence was insufficient to support the charge and the verdict. This contention appears to be based predominately upon an assertion that defendant may not be convicted upon his uncorroborated confession, and that one extrajudicial confession is not sufficient to corroborate another. *State v. Charity*, 587 S.W.2d 350 (Mo.App.1979) [5]. However, corroborative evidence may be circumstantial and there is no requirement

74

that it directly link the defendant to the crime. *State v. Garrett*, 595 S.W.2d 422 (Mo.App.1980) [8–11]. A confession corroborated by independent proof of the corpus delicti can support a conviction. *State v. Hawkins*, 165 S.W.2d 644 (Mo.1942) [8] *State v. Garrett, supra.* Corpus delicti in homicide consists of two elements—the death of a human being and the criminal agency of another in causing the death. *State v. Black*, 611 S.W.2d 236 (Mo.App. 1980) [4–7]. There can be no doubt that both of those elements were established here. In addition the location of the crime, the weapon used, the circumstances of the crime, Lisa's clothing, the presence of her bicycle at the scene, and Lisa's father's physical disability, all established by other evidence, were consistent with the extra-judicial confessions of defendant. The confessions were corroborated and were, with the circumstantial evidence, sufficient to make a case.

Defendant also claims that there was no evidence of motive or intent to kill. The confessions amply established those items, although, of course, motive is not an element of second degree murder. *State v. Mattingly*, 573 S.W.2d 372 (Mo. App.1978) [2]. Further, the nature of the attack is also sufficient to establish intent to kill. Evidence that the victim was killed by the intentional use of a deadly weapon upon a vital part of the body is evidence of intent to kill. *State v. Hammonds*, 459 S.W.2d 365 (Mo.1970) [1–4]. The tree limb, as used here, was a deadly weapon. *State v. Goodman*, 496 S.W.2d 850 (Mo.1973) [2]. The victim was struck with multiple blows, one or more of which caused her death, and was left to die. There was adequate evidence of intent to kill.

Defendant's final point is that the court erred in failing to give defendant's profered instruction defining "intended" as acting with premeditation and malice, and then defining those terms. Notes on Use 8 to MAI–CR 33.00 states that a term is not to be defined unless permitted by the Notes on Use under the form containing the term. Notes on Use of MAI–CR2d 15.14, the conventional second degree murder instruction used here, make no reference to defining the word "intended." To have done so would have been erroneous. *State v. Abram*, 537 S.W.2d 408 (Mo. banc 1976) [2, 3]. The rule in *Abram* is not abrogated because a manslaughter instruction is also given. This court has no authority to hold that the instructions adopted by the Supreme Court or the Notes on Use accompanying them are erroneous. *State v. Grady*, 577 S.W.2d 930 (Mo.App.1979) [1, 2].

Judgment affirmed.

SATZ and PUDLOWSKI, JJ., concur.