STATE of Missouri, Respondent,

v.

Dennis Lee MOUSER, Appellant.

No. WD 37022.

Missouri Court of Appeals,
Western District.

July 15, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 1986.

Kathleen Murphy Markie, Columbia, for appellant.

Kevin B. Behrndt, Asst. Atty. Gen., Jefferson City, for respondent.

Before CLARK, C.J., and NUGENT and GAITAN, JJ.

GAITAN, Judge.

Appellant, Dennis Lee Mouser, after being certified to be tried as an adult by the juvenile court, § 211.071 RSMo Cum.Supp. 1984, was charged with capital murder, § 565.001 RSMo Cum.Supp.1984, for the death of Errol Foster in Platte County, Missouri. He was convicted by a jury of manslaughter, § 565.023 RSMo Cum.Supp. 1984. The defendant appeals alleging trial court error on the following points: the denial of motions to suppress three different statements attributed to appellant; the submission to the jury of MAI–CR2d 2.20 (definition of reasonable doubt); the admission of photographic slides of the victim's skull as it appeared during the autopsy;

the refusal to sustain appellant's motion to strike a venireman for cause; and finally, the failure to sustain appellant's motion to dismiss the information and remand to the juvenile court jurisdiction. The judgment of the trial court is affirmed.

In order to address the numerous points raised by appellant, the facts in this case need to be discussed in some detail.

On December 29, 1983, Errol Foster, the victim, went outside to begin work on his farm as was his early morning routine. At approximately 9:00 a.m. a neighbor came by the home of Errol Foster's father and told him that he had seen his son's pickup in a ditch. At approximately 10:30 a.m., the father and a neighbor went to pull the pickup out of the ditch and then went in search of Errol Foster. They were joined in their search by the victim's son, Kendall. The victim's son eventually investigated an old house used as a hay barn where he found his dead father buried under some hay.

The Platte County Sheriff's Department was immediately notified and an investigation of the death began. Detective William Zerbe was in charge of the investigation. Detective Zerbe was acting coroner on that day and pronounced Errol Foster dead. The detectives followed footprints that led from the victim's truck to the appellant's mobile home. Appellant Mouser let Zerbe and two other officers, Burdiss and Thurman, inside the home.

In his response to general questions by Detective Zerbe, appellant stated to the police officers that he had been squirrel hunting with a .22 rifle in the woods earlier that morning. He showed the rifle to the detectives and appellant's mother gave her consent to the removal of the rifle by the officers.

At that point the officers took the rifle and departed, leaving Detective Zerbe at the trailer. Appellant's mother then stated she had to leave the room. Before she left, however, she gave permission to Zerbe to ask appellant a few more questions about being in the woods. Zerbe asked whether appellant had seen anything unusual while

he was out in the woods. At that point, Mr. Mouser replied, "I did not mean to shoot that man." Then Zerbe told appellant that he didn't want him to answer any more questions until his parents and the Platte County Juvenile Officer were present. Appellant was driven to the police station by Deputy Steve Johnson who was instructed not to question Mouser but to make a mental note of anything he said. On the way, they stopped near the crime scene to let Detective Zerbe out of the car. As they were leaving the scene appellant blurted out, "The keys are over there." He then indicated a northeasterly direction.

When they reached the police station, appellant was officially advised of his constitutional rights, both verbally and in writing. Detective Zerbe, appellant, Mr. Collins, (appellant's step-father) and Kate Dowd of the Platte County Juvenile Office were present. Appellant wrote in his own words what happened on that date and answered Detective Zerbe's questions in writing. In this statement, appellant admitted to the shooting and claimed it was an accident. He also admitted to dragging the body to a hay house and burying it there. He claimed he did not know if the victim was alive or dead.

Prior to impaneling the jury for trial, appellant moved to strike for cause venireman number 16, Charlie Jones, because of a response he believed showed bias. The thrust of the challenge concerns the fact that Mr. Jones was formerly a security guard and that his brother, at the time of trial, was a police officer. Appellant also alleges that Jones did not answer "unequivocally" that he would not automatically believe the testimony of a police officer over that of a non-police officer witness.

An autopsy was performed on the morning of December 30, 1983 by a Doctor Bridgens, the pathologist in the case. Dr. Bridgens testified at the trial using certain slides of the victim which defense counsel objected to as overly explicit and distasteful. This objection was also made in a motion in limine. Doctor Bridgens testified there were three gunshot wounds to the

body of the victim; one of which was a contact wound to the head. He testified that a "contact" wound occurs when a gun is placed directly against the head and discharged.

Appellant's evidence included testimony from Doctor Francis Cubbage, a pathologist at Kansas University Medical Center. Dr. Cubbage stated that if there was no gunshot residue found in the tissue of the brain it would be nearly impossible to determine whether or not the wound was a contact wound.

The appellant's first point on appeal concerns three different incriminating statements. Appellant asserts that his spontaneous admission, "I did not mean to shoot that man," should have been suppressed because it was obtained before Miranda warnings were given and because it was in violation of the Juvenile Code outlined in § 211.061.

The Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966):

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. ... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today. 384 U.S. at 478, 87 S.Ct. at 1629.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court re-examined the meaning of "interrogation" and stated the following:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.... [T]he term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300–02, 100 S.Ct. at 1689–90.

The state must prove that a juvenile's confession was given voluntarily for it to be admitted at trial. *State v. Jones*, 699 S.W.2d 525, 527 (Mo.App.1985). Whether a confession is voluntary is to be judged by the totality of the circumstances. *In Interest of A.D.R.*, 603 S.W.2d 575, 584 (Mo. banc 1980). A child taken into *custody* "must be accorded all of the rights to which he would be entitled if he were an adult, including full advice as to his constitutional rights in compliance with the *Miranda* decision." *State v. Larson*, 623 S.W.2d 69, 71 (Mo.App.1981).

The pertinent facts adduced both at trial and in the motion to suppress showed that on December 29, 1983 Detective Zerbe was investigating an incident involving a victim whose cause of death was, at that point, unknown. Zerbe was not even sure it was a homicide at that point. Footprints from the victim's truck led to appellant's residence, and appellant and his mother gave Zerbe and two uniformed officers permission to enter. Zerbe asked some general investigatory questions (name, age, etc.) and he testified that at that time he still did not suspect appellant of the crime.

In response to the detective's question about whether he had heard or seen anything unusual, appellant suddenly blurted out "I didn't mean to shoot that man." Only at this point did Zerbe determine he had probable cause to arrest appellant, which he did, and thereafter ceased all questioning.

In this first statement as in the statements which will be analyzed hereafter, the crucial issues to be considered are whether the two key elements of custody and interrogation were present when those statements were made. If they were, appellant was entitled to have his constitutional rights read to him. If those rights were not read to him, he would be entitled to

have those statements suppressed. *Miranda*, 384 U.S. 436, 86 S.Ct. 1602; *State v. O'Toole*, 619 S.W.2d 804, 810 (Mo.App. 1981). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

 Appellant contends that once he told Zerbe that he had been out in the woods squirrel hunting he was in effect, "in custody", and should have been immediately taken before the juvenile authorities. However, a person is not in custody when he is simply being asked investigatory questions by the police. *State v. Calmese*, 628 S.W.2d 382, 387 (Mo.App.1982). Custodial interrogation does not exist where the person is not a suspect in the crime. *State v. Baskerville*, 616 S.W.2d 839, 843 (Mo. 1981). Even assuming the person is a suspect, if he is not under arrest or otherwise restrained of his liberty, no custodial interrogation exists. *See Oregon v. Mathiason*, 429 U.S. 492, 493–496, 97 S.Ct. 711, 713–714, 50 L.Ed.2d 714 (1977).

> Miranda warnings are required only when there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. *Id.* at 495, 97 S.Ct. at 713.

In *Oregon v. Mathiason*, the suspect was interviewed by the police in a closed room at the police station where he made an admissible statement despite the lack of Miranda warnings. The atmosphere in Mouser's case was not nearly as coercive as the atmosphere in *Mathiason*. In *State v. Greathouse*, 627 S.W.2d 592, 594 (Mo. 1982), the court held that "by necessary implication, custodial interrogation does not exist where the person questioned is not in custody because he is not even a suspect in the crime, ... or, even assuming he is a suspect, where he is not under arrest or otherwise restrained of his liberty."

 Contrary to the assertions of appellant, the facts support the proposition that appellant was not under arrest nor even a suspect until the time he blurted out his admission. Detective Zerbe was engaged in routine questioning and conducted that questioning only after securing consent to do so from appellant and his mother. Appellant's reliance on *State v. Arbeiter*, 408 S.W.2d 26, 29 (Mo.1966), is misplaced because in that case the defendant was a suspect even before being placed in actual custody at a police station.

In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (quoted with approval by the court in *Calmese*, 628 S.W.2d at 387), the court stated:

> ... The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction. *Hoffa*, 385 U.S. at 310, 87 S.Ct. at 417.

In the case at bar, the appellant was not deprived of his freedom in any significant way. The trial judge was free to believe Detective Zerbe's testimony. It was not an abuse of discretion to deny the motion to suppress the appellant's incriminating statement.

Appellant contends that his second statement, "The keys are over there," in reference to the victim's truck, is an inadmissible coerced confession because he was in the "inherently coercive" setting of a patrol car. This statement was admissible for reasons similar to those presented to support the first statement's admission. Although the appellant was in custody, the statement is admissible because appellant was not being *interrogated*.

 As stated earlier, in order for the procedural safeguards outlined in *Miranda*

to apply, an individual must be both in *custody* and *interrogated*. *State v. O'Toole*, 619 S.W.2d 804, 810 (Mo.App. 1981). In the instant case, although appellant was in custody, he was not being interrogated by the police, much less interrogated in a way to elicit a damaging criminal admission. Deputy Johnson was specifically told *not* to ask any questions, but simply to transport him to the sheriff's department. The officer followed these instructions and did not say a word to the appellant; appellant simply blurted out "The keys are over there," as they passed by the victim's truck. This is a voluntary statement to which the Miranda rights do not attach. *State v. O'Toole*, 619 S.W.2d at 810–11; *State v. Mosby*, 667 S.W.2d 25, 26 (Mo.App.1984). Voluntary statements made by a defendant which tend to incriminate and connect him with the crime and which manifest consciousness of guilt are admissible as admissions against interest. *State v. Abercrombie*, 694 S.W.2d 268, 270 (Mo.App.1985).

In the case at bar, the appellant was not interrogated in any way. He volunteered this statement. The trial judge did not abuse his discretion in refusing to suppress the statement. *See Rhode Island v. Innis*, 446 U.S. at 300–02, 100 S.Ct. at 1689–90.

■ Next, appellant contends that the written narrative statement of his version of the murder was not a voluntary and intelligent waiver of his constitutional rights. There is no question that at this stage the appellant was in custody. The question is whether appellant was afforded his rights consistent with the mandates of the Juvenile Code. *State v. Simon*, 680 S.W.2d 346, 349 (Mo.App.1984); *State v. Larson*, 623 S.W.2d 69 (Mo.App.1981). As stated in *Larson*, a child taken into custody "must not only 'be taken immediately and directly before the juvenile court or delivered to the juvenile officer', § 211.061, he must be accorded all of the rights to which he would be entitled if he were an adult, including full advice as to his constitutional rights in compliance with the *Miranda* decision." *Id.* at 71–72.

Kathleen Dowd, the Chief Juvenile Officer, arrived at the sheriff's department after appellant was taken into custody. She waited for appellant's step-father, Mr. Collins, to arrive. He was notified pursuant to § 211.131 RSMo. Appellant was not subjected to any interrogation until his step-father arrived and he was read his rights. Dowd testified that she, along with Detective Zerbe, explained what they were doing each step of the way to both appellant and his step-father. The juvenile officer read appellant his rights, both juvenile and adult, from a juvenile statement form. This was done in the presence of appellant's step-father. The officer explained each sentence of each right in very simple terms and made sure appellant understood each right. Appellant's step-father looked on while appellant read and initialed each right. If he did not understand a right he was to write no. Both appellant and his step-father indicated that they understood the rights and both signed the form. *State State v. Jones*, 699 S.W.2d at 528–29.

In compliance with § 211.271, the juvenile officer did not participate in the questioning of Mouser which consisted of written questions and answers signed by appellant. *See State v. Simon*, 680 S.W.2d at 349–51. In fact, Dowd specifically told the appellant that she was not there as a friend, but simply to insure he was accorded his constitutional rights. Appellant and his step-father signed the statement along with Dowd and Zerbe. The responses to the questions were in appellant's own handwriting. At no time did appellant or his step-father indicate they did not understand the rights, desire to cease the interview, or ask for an attorney. In fact, appellant's step-father encouraged him to tell the truth knowing the police were investigating a homicide.

Appellant places much emphasis on his step-father's and his own alleged lack of intelligence. In *State v. Thomas*, 698 S.W.2d 942 (Mo.App.1985) the court held:

The ultimate test of voluntariness is whether or not the statement was the product of the defendant's free will.

*State v. Craig,* 642 S.W.2d 98 (Mo. banc 1982). That determination is to be made upon an evaluation of all of the circumstances under which the statement was given. *State v. Flowers,* 592 S.W.2d 167 (Mo. banc 1979).

In *State v. Jones,* 699 S.W.2d at 528–29, the juvenile officer read appellant's rights from a form which included both adult and juvenile rights, and this was held to be sufficient notice of the possibility of an adult prosecution. Appellant's implications that he did not fully understand what was at stake are simply not supported by the record. All the statutory procedures were complied with, appellant had both a "friendly adult" present, and a juvenile officer who made sure his rights were honored. Appellant's point must therefore be denied.

■ In appellant's next point on appeal, he contends the trial court erred in failing to remand this case to the juvenile court because there was no clear and convincing evidence supporting the juvenile court finding that appellant was not a proper subject for juvenile court supervision. Appellant was 16 years old when he caused the death of the victim.

"[A]ppellate review of a juvenile court's decision to terminate jurisdiction as to a youthful offender is limited to a determination of whether in the totality of the circumstances the court abused its discretion." *In Interest of A.D.R.,* 603 S.W.2d 575, 580–81 (Mo. banc 1980), citing *State v. Kemper,* 535 S.W.2d 241, 247 (Mo.App. 1977).

It is not the prerogative of the juvenile court to make a determination in the dismissal proceeding whether the juvenile is guilty of the offense charged. The court must review the evidence on the basis of the juvenile involved and the crime charged and determine whether if that juvenile is eventually found to have committed the crime he would be a fit subject to be dealt with under the juvenile code.... While the fact that a serious crime is involved does not, in and of itself, require certification, ... the seri-

ousness, and particularly the violent or vicious nature of the crime may constitute strong evidence that the juvenile is not a fit subject for the rehabilitative facilities of the juvenile court. *State v. Tate,* 637 S.W.2d 67, 71 (Mo.App.1982).

The criteria most convincing in support of certifying appellant as an adult were: (1) the seriousness of the offense; (2) the protection of the community; (3) the fact that the offense alleged was against a person; and (4) the lack of rehabilitative programs and facilities available to the juvenile court in considering disposition. Holding a gun directly against someone's head and firing it is a vicious and violent crime. A person who could do that poses a serious threat to society.

In the case of *State v. Tate,* 637 S.W.2d 67, which was mentioned earlier, the court relied on the vicious nature of the crime when it found no abuse of discretion by the juvenile court in certifying that defendant as an adult. In *Tate,* the defendant was convicted of bludgeoning a 13–year–old girl to death one week before his 16th birthday.

The court said that defendant's arguments to the contrary notwithstanding, "the bludgeoning death of a 13–year–old girl is a violent and vicious crime, the seriousness of which can hardly be disputed. It is strong evidence that the perpetrator constitutes a serious threat to society." *Id.* at 71. The court said the defendant showed no remorse or contrition. These are factors which may be considered in determining the potential for rehabilitation. *Id.* The *Tate* case is very similar to the case at bar.

The ultimate purpose behind the transfer of a juvenile is to protect the *public* in those cases where rehabilitation within the juvenile system appears impossible. *State ex rel. Arbeiter v. Reagan,* 427 S.W.2d 371, 377 (Mo. banc 1968); *In Interest of A.D.R.,* 603 S.W.2d 575.

Appellant argues that he did not have a history of repetitive and escalating offenses. That argument is well taken. However, there are other factors to consid-

er and when they are all taken together, there was more than enough evidence to justify certifying appellant as an adult. Appellant also argues that there was sufficient evidence to conclude that he was below average in intelligence and immature. There was actually conflicting testimony on this point. Dr. Urie, the clinical psychologist in the case stated appellant had an average to above average level of intellectual functioning. He also testified to appellant's immaturity and tendency to make decisions emotionally rather than intellectually. Taking all of this testimony into consideration, the juvenile court was within its discretion in finding that appellant was intellectually average. Appellant's argument that there were sufficiently secure and available rehabilitative facilities for him was directly contradicted by the evidence at the juvenile court certification hearing. The juvenile court in *A.D.R.*, 603 S.W.2d 575, based its dismissal on the fact that there were no adequate juvenile facilities for treatment, that the juvenile was not amenable to probation and that he constituted a danger to the community. The juvenile in *A.D.R.* had been charged with armed robbery. It is clear that the juvenile court judge did not abuse his discretion in *A.D.R.* just as it is clear the court did not abuse its discretion in the case at bar.

■ The issue raised by appellant's challenge of the voir dire is not a new one. Appellant argues that because venireman Jones had been a security guard and because his brother was at that time a police officer, he should be stricken for cause. He also argues that Mr. Jones' responses to questions testing his impartiality showed that he could not respond unequivocally that he would not give more credibility to a police officer's testimony.

The prosecutor questioned venireman Jones as to whether he might be more inclined to believe a police officer over a non-police witness and he replied: "No I would not be prejudiced at all." When asked if he could find that a police officer might be mistaken he answered, "Yes." He replied "That's possible, I guess," to the question, could you consider that a police officer might lie. He was then asked again if he could consider that a police officer might lie; to this he answered, "Well he gives an oath, so its a hard question to answer."

Finally, the prosecutor asked if he thought all persons under oath automatically tell the truth. Jones responded, *"No."*

The Supreme Court considered a similar problem in *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983). The Court stated:

[I]t is well established that the trial court has wide discretion in determining the qualifications of a venireman, and its decision thereon will not be disturbed absent a clear abuse of discretion and real probability of injury to the complaining party.... a determination by the trial judge of the qualifications of a prospective juror necessarily involves a judgment based on observation of his demeanor and, considering that observation, an evaluation and interpretation of the answers as they relate to whether the venireman would be fair and impartial if chosen as a juror. *Smith*, 649 S.W.2d at 422.

The responses of venireman Jones do not indicate, as appellant suggests, that he would automatically favor the testimony of a police officer over a civilian. Appellant fails to establish by the record that the court abused its discretion in not striking Jones for cause, and therefore he fails on this point.

■ In appellant's next point, he attempted by way of written motion in limine and objections at trial, to prevent the state's use of certain photographic evidence of the victim taken by the physician performing the autopsy. There were seven slides, the use of which the physician believed to be mandatory to the jury's understanding of the cause of the victim's death. The appellant objected to all of these slides but was especially concerned about the admission of two slides, exhibits 34 and 36, because they were "gruesome, cumulative, irrelevant and of little probative value."

Appellant alleged that exhibits 34 and 36 served only to inflame the jury inasmuch as number 34 depicts the skull completely exposed and number 36 depicts a section of the skull completely exposed. The state argued that number 34 shows a view of the skull that confirms its theory that the gun was placed to the victim's head and that number 36 supports the findings of number 34.

Appellate courts afford trial judges broad discretion in determining admissibility of photographic exhibits in criminal cases and admission thereof is error only if an abuse of discretion is shown. *State v. Guinan,* 665 S.W.2d 325, 331 (Mo. banc 1984); *State v. Sherrill,* 657 S.W.2d 731, 737 (Mo.App.1983); *State v. Burnfin,* 606 S.W.2d 629, 630 (Mo.1980).

In *State v. Clemons,* 643 S.W.2d 803 (Mo. banc 1983), the appellant objected to photographs which showed the burned bodies of victims. The court held that insofar as the photographs tend to be shocking or gruesome it is because the crime is gruesome.

> Accurate portrayals will always be inflammatory and the photographs here were not more gruesome than any photographs which would depict persons burned to death. *Id.* at 805.

In the case at bar, it was within the trial court's discretion to find that the slides were necessary to aid the pathologist in his explanation of the injuries of the victim. Although the slides were graphic, they were necessary to the state's argument that there was a "contact" wound to the victim's head. Therefore the decision of the trial court is affirmed.

Finally, appellant challenges the propriety of the trial court's submission defining proof beyond a reasonable doubt. This notwithstanding the fact that appellant acknowledges that the Missouri legislature in § 546.070(4) mandates a definition for the term "reasonable doubt" and further does not deny that the Supreme Court adopted the definition provided in MAI–CR 2.20.

However, the appellant has failed to properly preserve the constitutional issue in accordance with *City of St. Louis v. Butler Co.,* 219 S.W.2d 372, 376 (Mo. banc 1949).

Therefore, the giving of MAI–CR2d 2.20 was mandatory. *State v. Mick,* 674 S.W.2d 554, 558 (Mo.App.1984), is controlling. In that case, this court held that a "court is not free to declare as erroneous instruction forms adopted by the Supreme Court for standard use." *See State v. Grady,* 577 S.W.2d 930, 931 (Mo.App.1979).

For the aforesaid reasons the judgment of the trial court this case is affirmed.