**STATE of Missouri, Respondent,**

v.

**William J. BARTON, Appellant.**

**No. WD 38896.**

Missouri Court of Appeals, Western District.

Dec. 1, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 2, 1988.

Application to Transfer Denied March 15, 1988.

Robert G. Duncan, Kansas City, for appellant.

William Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and GAITAN and COVINGTON, JJ.

PRITCHARD, Presiding Judge.

By the verdict of a jury appellant was found guilty of the Class A felony of assault in the first degree, § 565.050 RSMo 1986, and was sentenced to life imprisonment on November 20, 1986.

The victim, a female child, Robyn, was 3½ to 4 months of age at the time of the alleged offense. She lived in the home of appellant and his wife with her unwed mother. Appellant was then unemployed and babysat the four children of his marriage, and also with Robyn after her mother was employed in a nursing home in August, 1985. On Sunday, September 8, 1985, the child's mother bathed her, fixed her bottle and left for work, leaving her with appellant. After becoming ill at work the mother left her work about 8:00 p.m., and when she arrived home, appellant was holding Robyn in a rocking chair, and told the mother that she had fallen out of a baby swing but he caught her before her head hit the floor, and her back and buttocks had, however, hit the floor. The mother observed Robyn in her crib. She was shaking, damp and cold, her eyes were dilated, there was swelling around her eyes and head, and she was having trouble breathing.

The mother took Robyn to the Liberty Hospital where she was seen by Dr. John Bean. He testified that when Robyn arrived, she was near death. A breathing tube was inserted and cardiopulmonary resuscitation was used. Dr. Bean observed bruising on the child and there was pressure within the brain caused by a striking of the head against a solid object, and he also found abrasions and tears within the rectum which, in his opinion, were caused by a forceful insertion of a hard object, the

tears being caused within the last 2 or 3 days.

After about 25 minutes, Robyn was transported by helicopter to Children's Mercy Hospital, where she was seen by pediatrician Dr. Irene Walsh who testified about her condition and visible injuries, and that if she had not been cared for she would have died. There were at least 36 sites of impact, and she found broken ribs and a broken right femur, and there had been an object forced into the anus which would not be caused by rough towelling unless the towel were pushed into the rectum. Robyn was discharged from Children's Mercy on September 16, 1985, and was evaluated in April, 1986, at 11 months of age at which time she was apparently normal.

In his sole point, appellant contends that the court erred in overruling his motion to suppress and in admitting over his objections his statement, Exhibit #1, because prior to giving that statement he had exercised the right to request to consult with an attorney. The facts giving rise to this claim are these: Officer Truschingea interviewed appellant at the hospital and he denied any knowledge of the injuries. On September 9, 1985, Detective Clarence Luther interrogated appellant and again he denied guilt. Appellant and his wife were interrogated on September 16, 1985, at police headquarters, where he again denied guilt, but both he and his wife agreed to take polygraph examinations. Detective Ashley Hurn then escorted appellant to the polygraph unit where the examination was to be conducted by civilian police employee, Marby. After about an hour appellant told Marby that he wanted to consult an attorney and the test was ended.

As appellant was leaving the polygraph unit, he saw Detective Hurn. Appellant indicated to Hurn that he felt uneasy with Marby because he was going back 25 years in his personal life which appellant thought was no business of his or the police department. In his statement appellant answered a question put by Hurn: "The polygraph examiner started asking me questions to do with my mental state about twenty-five years ago, and I became angry because I did not feel what has happened to me twenty-five years ago had anything to do with this case. So to make him stop asking questions, I told him I wanted to speak with a lawyer, and he stopped the interview. Question—After your polygraph interview, did I, Detective Hurn, give you an opportunity to talk with me about this offense while indicating to you that I would ask you no questions about anything except what pertained to this case. And did you indicate to me that you wished to talk to me about this offense? Answer—Yes, you did those things, and I did say that I wanted to talk to you about this case."

Hurn (again), before taking the statement, advised appellant of his rights, and he signed a Miranda waiver which included the right to have a lawyer present. A prior waiver form, describing appellant as being a person in custody, was signed by him on September 16, 1985. Hurn, however, testified that at the time he gave the statement, appellant was not under arrest or in custody.

Appellant's statement given to Hurn related that Robyn was asleep in her baby bed until about 5:45 p.m., when she started crying. He warmed up a baby bottle and gave it to her. She took it and stopped crying, but started again. He took her to the recreation room, put her in the baby swing, and rocked her in a chair for a few minutes, but she did not stop crying. He changed her diaper, sat her in her car seat by the television, but she did not stop crying. He thought that giving her a bath would calm her down so he took her upstairs to the bathroom, filled her plastic bath tub with lukewarm water from the faucet, undressed her and put her in the tub. He was angry that Robyn would not quit crying because he had done everything he knew to make her stop. When he put her in the tub he grabbed hold of her with a hard grip on her legs and her shoulder and dropped her about two feet into the water, and then repeated the dropping. Then he became more angry, picked her up the same way and threw her hard down into the plastic bath tub. Her head hit real hard on the back of the tub each time he

dropped her when he threw her down. He grabbed her around the neck in removing her from the tub. He dried her off roughly with a towel, but denied inserting anything into her rectum.

Although appellant argues that he was in custody as shown by the initial Miranda warning form and thus cases apply, such as *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966); *Edwards v. Arizona,* 451 U.S. 477, 68 L.Ed.2d 378, 101 S.Ct. 1880 (1981), requiring that interrogation cease after there is a request to see a lawyer, such is not the case here. The testimony of Hurn that appellant was not under arrest or in custody during and after his polygraph interview, show that he was not deprived of his freedom. In *State v. Mouser,* 714 S.W.2d 851, 855 (Mo.App. 1986), Miranda was quoted, " 'By custodial interrogation, we mean questioning *initiated* by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (Italics added.) See also *State v. Greathouse,* 627 S.W.2d 592 (Mo.1982). Here, as the record shows, appellant was free to go, and did in fact go home after completing and initialing each answer on his typewritten statement. The trial court did not rule the motion to suppress on the basis of a noncustodial interrogation.

The determinative facts on the issue as ruled by the trial court are these. Appellant's wife, who also wished to take a polygraph test, was being escorted to a different polygraph operator by Detective Hurn. By coincidence, Hurn arrived at the termination of appellant's polygraph examination. At that time, as a coincidence, appellant and Marby came out, and appellant joined Hurn, indicating that he was displeased, and told Hurn that he wanted to cooperate but did not want to answer questions about 25 years ago. Appellant then indicated that the only reason that he had asked for an attorney was simply to get out of the polygraph session, and he was not requesting a lawyer. The second waiver form, also then signed by appellant, did include that of the right to counsel.

In *State v. Bannister,* 680 S.W.2d 141, 147–148 (Mo. banc 1984), appellant claimed certain statements were admitted which were obtained in violation of his right to counsel. He was advised of his Miranda rights twice, on the second of which he refused to sign a waiver form, indicating his desire to wait for an attorney. Questioning ceased. Later, he volunteered certain information to the officers, but a sheriff declined to talk with him. The next day appellant met with the sheriff and two officers who then advised him of his Miranda rights. Appellant stated he understood his rights and wanted to talk, and signed a written waiver, and accompanied officers to the scene of the murder where he continued his commentary on events prior to and immediately following the shooting. On returning to the sheriff's office, he was again read his Miranda rights, and gave the officers an account of the crime from its inception to his arrest. The court said, page 147–48[17, 18], "A request for counsel bars further interrogation until an attorney is present, unless the accused in the interim voluntarily initiates discussion. (Citing Edwards, supra)." It was noted that when appellant requested an attorney interrogation stopped, and the court said further, "Defendant's repeated expressions of willingness to talk in the absence of counsel, his volunteered statements to officers about the shooting, his response that he understood his rights, as well as his action in signing the waiver form, show a valid waiver. This establishes that the law enforcement officers respected defendant's right to have counsel present during interrogation; he himself initiated further discussions, then knowingly and intelligently relinquished his rights and voluntarily gave a statement. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *State v. Boggs,* 634 S.W.2d 447 (Mo. banc 1982)." See also *State v. Morris,* 719 S.W.2d 761, 762–63[1, 2] (Mo. banc 1986), and cases cited. Because, after the polygraph examination was halted, appellant initiated the interview with Detective Hurn, and thereafter waived his right to have counsel present and confessed to him, the sole contention is

without merit. The record shows that appellant was not overreached in any way.

The judgment is affirmed.

All concur.