

# In the
# Missouri Court of Appeals
# Western District

IN THE INTEREST OF: K.X.B.,     )
                                )
          Appellant,      )
                                )     **WD86371**
     v.                    )     **OPINION FILED:**
                                )     **AUGUST 27, 2024**
JUVENILE OFFICER,     )
                                )
          Respondent.    )

**Appeal from the Circuit Court of Vernon County, Missouri**
**The Honorable David R. Munton, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding, Gary D. Witt, Judge,**
**Janet Sutton, Judge**

K.X.B. appeals the judgment of the Vernon County Circuit Court dismissing his juvenile cause of action and transferring him to the court of general jurisdiction for prosecution under the general law. In his sole point on appeal, he claims that the court erred because he was a sixteen-year old boy who had been completely abandoned by the legal system and had not previously received any substantive intervention. The judgment is affirmed.

## Facts

K.X.B. ("Juvenile") was born in late 2006. His mother died in a motor vehicle accident less than two years later. The man listed as Juvenile's father on his birth certificate was last known to live in Hawaii and was unwilling to assume the duties of

fatherhood.  Temporary letters of guardianship were issued in 2008 to R.B. ("Guardian").

Guardian was appointed as Juvenile's guardian almost four years later in 2012.

Guardian routinely failed to file guardianship status reports.  The court sent

Guardian delinquency notices for failure to file six times between 2009 and 2021.  Eight

citations for failure to file were issued to Guardian between 2015 and 2022.  A writ of

body attachment was issued, and Guardian appeared at an August 2018 hearing.  He

never appeared again despite subsequent notices and citations commending him to appear

and the issuance of a summons.  In October 2022, the court terminated the guardianship

because of Guardian's failure to comply with court orders.  Juvenile was fifteen years-old

at the time.

In May 2023, the State of Missouri ("the State") filed a petition alleging Juvenile

committed a delinquency offense in May 2023 which would be the class A felony of

assault in the first degree if Juvenile were an adult.  The petition alleged that Juvenile

shot M.E. twice with a 9mm handgun.  Juvenile was sixteen-years old at the time of the

alleged offense.  In June 2023, the State filed a motion to dismiss the petition to allow for

prosecution of Juvenile under the general law.

The certification report was prepared by the Deputy Juvenile Officer T.F.

("Juvenile Officer").  The report stated Juvenile had 11 referrals in the prior six years.

None of those referrals were adjudicated.  Those referrals were as follows:

March 2017 – Behaviors Injurious to Self/Others

November 2018 – Assault 4th Degree

2

December 2018 – Harassment 2nd Degree

June 2020 – Stealing – Value Less than $150 and No Prior

March 2020 – Assault 4th Degree

Unknown – Person Less than 18 Years Old Purchase, Attempt to Purchase or Possess Cigarettes or Tobacco/Alternative Nicotine/Vapor Products 1st

October 2021 – Assault 4th Degree

June 2022 – Property Damage 2nd Degree; Possession of Controlled Substance Except 35 Grams or Less of Marijuana/Synthetic Cannabis; Resisting Arrest/Detection/Stop by Fleeing – Creating a Substantial Risk of Serious Injury/Death to Any Person

October 2022 – Habitually Absent from Home

May 2023 – Beyond Parental Control

May 2023 – Assault 1st Degree

The certification report indicated no report had been received for a February 2023 incident. The certification report stated:

> [Juvenile] has always shown a respect towards this officer but has always been combative and uncooperative with law enforcement, he always makes excuses and everything in life is always someone else's fault that he acts the way he does. His associations with other juveniles who live a criminally institutionalized mentality towards adults and continue to make inappropriate choices makes [Juvenile] guilty by association. He fails to accept responsibility for his own actions and has been known in the community of Vernon County as well as in Camden County for brandishing a handgun, fleeing from law enforcement, and/or acting out when placed in detention.
> The current detention facility has sent the following in regards to asking for a transfer of placement for [Juvenile] for behaviors as follows: As for [Juvenile] the majority of his struggles are in the evening. He does not take redirection well and becomes agitated, in which there has been two

3

occasions where such has escalated verbally. The first incident [in May 2023] was with another resident where [Juvenile] made a comment upsetting another resident who responded back leading to both then standing toe to toe with each other and [Juvenile] announcing in front of everyone he's here for attempted murder. Staff intervened before anything became physical and sent each to their rooms. However, after being separated [Juvenile] continued to make comments about beating this kid's ass. This was addressed and at this time there has been no further issues with [Juvenile] and this resident.

The second incident was [in May 2023]. [Juvenile] was sent to dayroom for arguing with staff in an aggressive manner. After being sent to the dayroom to cool off he continued to use the intercom system to make [threats] towards a staff member such as "I'm going to catch a charge for fucking up Tony" and "I'm going to get you Tony."

Placement in a different detention facility has not been obtained at this time …. No other facility has been willing to accept [Juvenile].

With respect to the sophistication and maturity of Juvenile, the certification report noted that [Juvenile] has been living his life as an adult in charge of himself. With respect to available programs and facilities, the certification report stated that "[t]he only viable option for [Juvenile] at this point would be a commitment to the Division of Youth Services, and [Juvenile's] actions show that he would not be compliant."

The court held a hearing on the State's motion; the only witness was Juvenile Officer. Her first interaction with Juvenile was in February 2023 when she received a referral from the Camden County Police Department. Juvenile was remanded to detention on a 24 hour hold because he brandished a firearm in a local bar. The police department never sent a report, and Juvenile was released into the custody of B.H. who was described as an aunt figure to Juvenile. B.H. was supposed to pursue custody of Juvenile. Juvenile stole the handgun at issue from B.H.'s boyfriend. B.H. never obtained

4

guardianship over Juvenile. She kicked Juvenile out of her home a few months later because she could not control his actions.

Juvenile Officer received a referral for Juvenile in March 2023. That referral alleged Juvenile brandished a handgun in Vernon County and was drinking with a group of juveniles. Juvenile Officer was unable to make contact with Juvenile regarding this referral because "there was no adult and he was nowhere to be found."

Juvenile Officer received a referral for Juvenile in April 2023. That referral was also for possibly brandishing a handgun, pointing the gun at residents in the community, and drinking. Juvenile Officer was again unable to make contact with Juvenile.

Juvenile Officer received a referral for the incident at issue in the current case. That referral, in May 2023, alleged that Juvenile brandished a firearm and shot M.E. ("Victim"). Juvenile turned himself into the Nevada Police Department the day after the shooting. He has remained in custody since that time.

Juvenile Officer testified that Juvenile lived with his mother and Guardian, who was his stepfather, until his mother died. After she died, Guardian obtained custody of Juvenile and Juvenile's sister. Juvenile has not had a legal guardian since October 2022 when Guardian's guardianship was terminated by the court due to noncompliance from Guardian. Juvenile Officer has never been able to speak with Guardian.

As far as Juvenile Officer could tell, Juvenile last attended school when he was in the eighth grade. Juvenile Officer completed a social history for Juvenile. Juvenile had received at least eleven referrals in the prior six years in the 28th Circuit. While B.H.

allowed Juvenile to live with her for a time, Juvenile Officer testified that "as far as I know there has been no other friendly adult that has taken [Juvenile] in. He has pretty much been to his own resources." When asked where Juvenile stays, Juvenile Officer stated "He is all over the State. I mean, we have had him from Camden County to Branson, Missouri. He visits his sister in Fort Scott sometime." With respect to Juvenile's attitude, Juvenile Officer testified that he "has always been very respectful towards me." She stated that "[a]llegedly he has been uncooperative with law enforcement. And I don't think that's all his fault; I think he has not had anyone to guide him properly."

When she received the first referral in February 2023, Juvenile Officer made a hotline call because Juvenile was in custody and did not have a guardian. Juvenile Officer made another hotline call in April 2023 because Juvenile was released to an adult who was not his guardian. Despite these two hotline calls, Juvenile Officer testified that the Children's Division has declined to do anything about Juvenile being in the community without a legal guardian.

Juvenile Officer completed the certification report about Juvenile. Juvenile Officer believed the seriousness of Juvenile's offense required transfer to the court of general jurisdiction. The allegations involved the use of firearms to harm someone. The firearm has never been located, and Juvenile has a history of obtaining firearms. Juvenile Officer believed the use of physical force or violence required transfer to the court of general jurisdiction. To her knowledge, Juvenile did not know Victim; and the shooting

6

was a random act.  The alleged offense was against a person as opposed to property and resulted in a permanent injury.  Victim was shot twice, was life flighted to a hospital, underwent numerous surgeries, and was on life support for a short amount of time.  Victim has had to have a colostomy bag as a result of the shooting.

Juvenile Officer believed that the shooting was part of a repetitive pattern of offenses that showed Juvenile was beyond rehabilitation under the juvenile code.  Juvenile had referrals for firearms for multiple months.  Juvenile Officer testified she had been unable to offer Juvenile services to break that repetitive pattern: "[S]hort of talking with the guardians that he has been released to, who have been uncooperative in getting him proper guardianship, trying to get ahold of [Juvenile] and get him the services that he needs was unsuccessful in the placement."

When discussing Juvenile's experience with the juvenile justice system, Juvenile Officer stated that Juvenile "has been acting as an adult for over six months.  And you know, he has had opportunities to reach out to me and has chose other paths and made poor choices in our community."  Juvenile Officer stated that Juvenile had her contact information.  When asked about Juvenile's sophistication and maturity, Juvenile Officer stated Juvenile should be transferred to a court of general jurisdiction because "[h]is maturity and methodical thinking, he thinks like an adult, rather than a 16 year old."  When asked why she felt this way, Juvenile Officer testified:

> Just in the allegations, I mean, he has brandished a firearm.  He knew to turn himself in the next day….  He has the potential to make good choices;

he has just chose to not. He alludes law enforcement, continues to run from them, which is something that a juvenile would not normally have done.

Juvenile Officer testified that Juvenile has not sought to engage in any kind of education as a homeless child. When asked if Juvenile was making his own decisions, Juvenile Officer stated "[t]o an extent." Juvenile Officer believed it was Juvenile's decision to frequently relocate and not remain in any one place to create stability.

Juvenile Officer was asked about the services available to Juvenile:

Q. If a referral like this had come into the Juvenile Office when he was maybe younger, what kind of services do you believe that you could have provided to him?

A. I would have provided, first off, like an informal supervision, as well as moving up to a family centered service case with Children's Division to help a guardian properly parent him, as well as then moving on to some counseling services and mental health services, and you know, just making sure that he attended school regularly.

Q. Why are those not viable options now?

A. Umm, because he has made the decision to not come forth and not want to help himself. It is always somebody else's fault.

Q. What options would currently be available to him at this point through the Juvenile Court system?

A. Other than a DYS commitment, I would have no other services to offer him at the juvenile level.

Q. And in this kind of situation, is there a reason that the transfer to the court of general jurisdiction would be more appropriate than a Division of Youth Services commitment?

A. Because the charges that are alleged would be a felony, if he was an adult.

The court questioned Juvenile Officer about past services:

> THE COURT: Has he had any kind of intervention, other than sending him home with someone who is supposed to get guardianship? Have we done anything at all?
>
> [Juvenile Officer]: Not to my recollection.

Juvenile Officer testified that Juvenile is not part of a protected class and racial disparity was not a consideration.

The court found that the alleged offense is serious and the alleged offense involved viciousness, force, and violence. The alleged offense involved a handgun. Juvenile is accused of shooting a victim he did not know. The alleged offense is part of a repetitive pattern of offenses which indicate Juvenile may be beyond rehabilitation by the juvenile code. Juvenile has had "11 referrals and the record and history of the juvenile reflects the juvenile has previously received the following rehabilitative services of detention facilities, children's division and the juvenile failed to derive benefit from said services." The court found that "the juvenile is an emotionally sophisticated and physically mature 16 year-old." The judgment stated that "no placement, program or facility available to the court for the juvenile's treatment under the juvenile code would provide sufficient protection to the community and that "protection of the community requires transfer to the court of general jurisdiction." Finally, the court found:

> [T]here was no evidence that the juvenile would benefit from treatment in a juvenile facility. Given the seriousness and particularly violent and vicious nature of the offense, the age of the juvenile and the limited time for rehabilitating someone who is charged with this particular offense, and the fact that no evidence was adduced to demonstrate the availability of a

9

facility which would guarantee the juvenile's confinement, it is apparent that there are no reasonable prospects for rehabilitation[.]

The court dismissed the juvenile action and transferred the case for prosecution under the general law.

This appeal follows.

## Standard of Review

"A judgment dismissing a juvenile from the juvenile division's jurisdiction is final and appealable." *R.S. v. Dunklin Cnty. Juv. Off.*, 685 S.W.3d 600, 605 (Mo. App. S.D. 2024) (internal quotation marks omitted). "We review the decision to certify a juvenile to the court of general jurisdiction by examining the totality of the circumstances to determine if the [juvenile] court abused its discretion." *Id.* (internal quotation marks omitted). "A [juvenile] court abuses its discretion when its ruling is so unreasonable and arbitrary that it shocks the sense of justice and is clearly against the logic of the surrounding circumstances." *Id.* (internal quotation marks omitted). "In reviewing a juvenile court's determination for an abuse of discretion, we will not reweigh the evidence or determine the reliability or credibility of the witnesses." *Id.* (internal quotation marks omitted). "The facts in evidence and the reasonable inferences are viewed in the light most favorable to the [juvenile] court's judgment when reviewing the sufficiency of the evidence." *Id.* (internal quotation marks omitted).

## Analysis

In his sole point on appeal, Juvenile claims the trial court abused its discretion in dismissing the juvenile cause of action and transferring him to the court of general jurisdiction for prosecution under the general law. Juvenile states he is a proper subject to be treated under the juvenile code. He argues he was a sixteen year-old boy who had been completely abandoned by the legal system, and he had not previously received any substantive intervention.

"[I]f a petition alleges that any child has committed an offense which would be considered … first degree assault under section 565.050 … the court shall order a hearing, and may in its discretion, dismiss the petition and transfer the child to a court of general jurisdiction for prosecution under the general law." Section 211.071.1.[1]

> A written report shall be prepared … developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper subject to be dealt with under the provisions of this chapter and whether there are reasonable prospects of rehabilitation within the juvenile justice system.

Section 217.071.6.

> These criteria shall include but not be limited to:
>
> (1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;
>
> (2) Whether the offense alleged involved viciousness, force and violence;
>
> (3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

---

[1] All statutory citations are to RSMo 2016 as supplemented unless otherwise indicated.

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

(6) The sophistication and maturity of the child as determined by consideration of his or her home and environmental situation, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

*Id.*

"In assessing these non-exhaustive factors, the juvenile court is entitled to significant discretion" and "need not give equal weight to each of the listed factors, nor is it required to make an express finding on each one." *R.S.*, 685 S.W.3d at 606 (internal quotation marks omitted). "It is only required … to make findings showing the reasons underlying the court's decision to transfer jurisdiction in a manner that is sufficient to permit meaningful appellate review." *Id.* (internal quotation marks omitted). The trial court found that the first nine factors weighed in favor of dismissing the petition to allow

12

for prosecution of Juvenile under the general law. The tenth factor, racial disparity in certification, was neutral.

The first three factors are "the seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;" "[w]hether the offense alleged involved viciousness, force and violence;" and "[w]hether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted." Section 211.071.6(1)-(3). "The first three statutory factors are the most critical considerations in certification." *R.S.*, 685 S.W.3d at 606 (internal quotation marks omitted). "Importantly, the first factor, the seriousness of the alleged offense, is a dominant criterion among the ten factors." *Id*. (internal quotation marks omitted). "In assessing the statutory criteria, such as the seriousness of an alleged offense, the juvenile court is entitled to significant discretion." *Id*. (internal quotation marks omitted).

The allegations in this case involve shooting a person who was not known to Juvenile. The shooting was a random act. Victim was shot twice, was life flighted to a hospital, underwent numerous surgeries, and was on life support for a short amount of time. Victim has had to have a colostomy bag as a result of the shooting. The court found that the first three factors weighed in favor of certifying Juvenile as an adult. This was not an abuse of discretion given these facts.

The fourth and fifth factors are "[w]hether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation

13

under the juvenile code" and "the record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements." Section 211.071.6(4)-(5). "[P]rior referrals, even those which were dismissed, are proper subjects of the juvenile court's certification inquiry." *R.S.*, 685 S.W.3d at 608 (internal quotation marks omitted). "We defer to the juvenile court's assessment regarding [the juvenile's] pattern of conduct and his prior experience with the juvenile system and do not weigh the evidence anew." *Id*.

Juvenile had 11 referrals in the years prior to the shooting. He had allegedly brandished a firearm in public multiple times in the months prior to the shooting. Juvenile has had issues in his current detention facility to the point that the facility no longer wants Juvenile there. No other facility is willing to take Juvenile. The court found these factors weighed in favor of certification. This was not an abuse of discretion. "The juvenile court may freely give weight to the juvenile's repetitive pattern of offenses and the juvenile's record and history as it sees fit." *A.R.K. v. Juv. Officer*, 666 S.W.3d 233, 242 (Mo. App. W.D. 2023).

The sixth and seventh factors are "[t]he sophistication and maturity of the child as determined by consideration of his or her home and environmental situation, emotional condition and pattern of living" and "[t]he age of the child." Section 211.071.6(6)-(7). Juvenile was sixteen years old at the time of the shooting. The evidence at trial was that Juvenile has been acting as an adult for quite some time. The court found that "the juvenile is an emotionally sophisticated and physically mature 16 year-old." This was

not an abuse of discretion. "We defer to the juvenile court, as it was is in the best position to observe [the juvenile] and determine whether this factor weighed for or against certification." *R.S.*, 685 S.W.3d at 608; *see also Interest of T.D.S.*, 643 S.W.3d 510, 525 (Mo. App. E.D. 2021) (trial court did not err in finding that juvenile's "pattern of absconding from home while subject to court monitoring, drug use, poor behavior in school, and medical issues stemming from a shooting incident demonstrated a high level of sophistication [...] not normally seen in a 17 year old" (internal quotation marks omitted)).

The eighth and ninth factors are "[t]he program and facilities available to the juvenile court in considering disposition" and "[w]hether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court." Section 211.071.6(8)-(9). "We defer to the juvenile court's findings regarding the time needed to rehabilitate a juvenile. A juvenile court may properly find, in its discretion, a period of even five years may not be enough to rehabilitate a juvenile." *R.S.*, 685 S.W.3d at 608 (internal quotation marks omitted). "Each juvenile is unique, and resources which may benefit one are not necessarily helpful to another." *Interest of D.G.J.*, 669 S.W.3d 169, 175 (Mo. App. E.D. 2023) (internal quotation marks omitted). "The ultimate purpose for allowing a juvenile to be tried as an adult is to protect the public in cases where further treatment within the juvenile system would be unavailing." *A.R.K.*, 666 S.W.3d at 244.

The trial court found no services were available in the juvenile system to adequately protect the community. This was not an abuse of discretion given the

15

evidence presented. *See C.L.F. v. Juv. Officer*, 657 S.W.3d 273, 281-82 (Mo. App. W.D. 2022) (finding that juvenile had no intention of being reformed by juvenile justice system was supported by indications juvenile had engaged in a conscious pattern of behavior and deliberately violated the law and juvenile's statements that the Division of Youth Services was kiddy jail"); *see also State v. Seidel*, 764 S.W.2d 517, 519 (Mo. App. S.D. 1989) (the limited time a juvenile would be in the Division of Youth Services, while not a section 211.071.6 factor, is relevant to the suitability of the juvenile justice framework).

Juvenile argues on appeal that it is not fair for the government to completely abandon him and then fault him for making bad choices. The facts of this case involve a juvenile who has been alone for quite some time. He has not had a guardian. He has not attended school. He has not had a stable environment. The Juvenile Officer made two hotline calls to the Children's Division and nothing was done. Juvenile Officer testified:

> Q. And you say also in your Court Report that [Juvenile] has been given many different opportunities to be successful. What are those opportunities?
>
> A. He had an opportunity to stay with [B.H., his aunt figure] and clean up his act and quit stealing from her. And she, he didn't do that. So, she provided him a home and he chose not to stay there.
>
> Q. Okay, that is one. You said "many different opportunities." What else?
>
> A. Umm, he could have went home with [Guardian] at any point. He knew where he was.
>
> Q. And [Guardian], the Court found him not to be a suitable guardian, in that the guardianship was canceled. Isn't that true?
>
> A. For not filing of the paperwork.

Q. It was canceled by the Court?

A. Yes.

Q. Now [Juvenile] hasn't been enrolled in school for at least the last eight months?

A. Yes.

Q. What have you done about that?

A. He was withdrawn from school by [Guardian].

Q. Okay, so what have you done about it?

A. He wasn't enrolled in Vernon County School, so I wouldn't have had anything to do with that.
…
Q. And is it your testimony, and wouldn't you agree with me, that even when he had a guardian, and more specifically for the last eight months, [Juvenile] has had no one to oversee him?

A. Yes.

Q. No adult to oversee him?

A. Yes.

Q. No adult to mentor him?

A. Yes.

Q. Or to model appropriate behaviors him?

A. Yes, I would agree with that.

Q. Okay and isn't the purpose of the Juvenile Office to rehabilitate a juvenile?

A. Yes, it is.

17

Q. But nothing really has been done on [Juvenile's] behalf in the last eight months. True?

A. True.

…

Q. You stated that [Juvenile] has been acting as an adult for over six months. Do you consider his actions those of an adult?

A. Not of a proper adult, no.

…

Q. You said he could always come into custody. Well why wasn't he put in custody? That's the question.

A. Children's Division closed their referrals.

…

Q. So when going through Exhibit 2, it is your testimony that [Juvenile] has the sophistication and maturity -- let me see exactly what that says – as determined by consideration of his home and environmental situation, emotional condition and pattern of living. You said that, "[Juvenile's] actions and behaviors showed that it has sophistication and maturity in it's decision making." Is that your testimony?

A. That is my testimony because he has no repercussions for what he has done.

Q. And he has no adult in his life to see that he has repercussions?

A. Exactly. True.

Q. To direct him?

A. Exactly. That is true.

Q. And you state, "He has made the decision to constantly move from place to place on his own, without any legal caretaker." Right?

A. Yes.

Q. So is it his fault he doesn't have a legal caretaker?

18

A. No, that is not his fault. However, he could have contacted his grandmother or [Guardian]. He knew where they were.

Q. Okay, so he should have contacted them and asked them to file for guardianship. Is that what you are saying?

A. Yes, I am.

To put it bluntly, Juvenile is a child who has fallen through the cracks of the system meant to help him. This current situation is deeply unsettling and tragic. In many ways, Juvenile is a victim.

However, this current case involves another victim. One who was the victim of a random act of violence and who has suffered tremendously and permanently allegedly because of Juvenile. The person who Juvenile allegedly shot twice was life flighted to a hospital, underwent numerous surgeries, and was on life support for a short amount of time. The shooting victim had to have a colostomy bag as a result of the shooting. The nature of this alleged crime is serious and troubling. It's fair to say that the shooting victim's situation is as equally unsettling and tragic as Juvenile's situation.

The trial court was also concerned about Juvenile's history. It even questioned Juvenile Officer directly about the lack of services offered to Juvenile:

THE COURT: Has he had any kind of intervention, other than sending him home with someone who is supposed to get guardianship? Have we done anything at all?

[Juvenile Officer]: Not to my recollection.

The court ultimately concluded, however:

19

> Given the seriousness and particularly violent and vicious nature of the offense, the age of the juvenile and the limited time for rehabilitating someone who is charged with this particular offense, and the fact that no evidence was adduced to demonstrate the availability of a facility which would guarantee the juvenile's confinement, it is apparent that there are no reasonable prospects for rehabilitation[.]

This case involves an older juvenile who has a history of allegedly brandishing firearms in public and who allegedly committed a very serious crime against a person. "A decision to waive juvenile jurisdiction is not dependent on extensive prior efforts by the juvenile court to rehabilitate the child." *State v. Tate*, 637 S.W.2d 67, 71 (Mo. App. E.D. 1982), *overruled on other grounds by State v. Carson*, 941 S.W.2d 518 (Mo. banc 1997).

The trial court in this case thoughtfully analyzed all of the factors in section 211.071.6. It "conducted a full hearing complying with due process and fair treatment and assessed each factor listed in section 211.071." *M.T. v. M.T.*, 658 S.W.3d 125, 135 (Mo. App. S.D. 2022). "Our standard of review does not allow for us to reweigh the evidence, or to determine the reliability or credibility of the witnesses." *J.N.W. v. Juv. Officer*, 643 S.W.3d 618, 633–34 (Mo. App. W.D. 2022) (finding no abuse of discretion where the trial court certified the juvenile as an adult even though the Juvenile Officer did not recommend the certification). The trial court's judgment was not an abuse of discretion. *See Interest of D.J.S.*, 670 S.W.3d 249, 254 (Mo. App. E.D. 2023) ("Even had the circuit court erred in finding the fourth factor weighed in favor of certification, the 'critical considerations' of the first three uncontested factors suggest a lack of prejudice."). The point is denied.

20

## Conclusion

The judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

21